



U.S. DISTRICT COURT
**NO**RTHERN DISTRICT OF TEXAS

FILED

JUN 2 2 2015

CLERK, U.S. DISTRICT COURT
By _____
              Deputy

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF TEXAS

### FORT WORTH DIVISION

Irwin A. Schiff,

      (Plaintiff-Petitioner)

v.                        No.: 4:15 CV-454-Y

Rodney Chandler, Warden,

FCI Fort Worth,

      (Defendant-Respondent)


## MEMORANDUM OF LAW
## IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN FEDERAL CUSTODY

COMES NOW Irwin A. Schiff, (Plaintiff-Petitioner), in support of his Petition for Writ of Habeas Corpus by a Person in Federal Custody, stating as follows:


### JURISDICTION

Petitioner is currently a federal inmate, in the custody of Rodney Chandler, Warden, FCI Fort Worth, Texas, and the Defendant-Respondent. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §2241.

1

## STATEMENT OF THE CASE

On March 24, 2004, Petitioner and two co-defendants were named in a 33 count criminal indictment filed in the Federal District Court of Nevada in Las Vegas. Petitioner was named in 13 counts.

Count #1 charged a Klein conspiracy in violation of 18 U.S.C. § 371.

Counts #2 thru #6 charged that Petitioner aided and assisted others in filing false and fraudulent income tax returns, alleging violations of 26 U.S.C. §7206(2).

Count #17 charged that Petitioner had attempted to evade and defeat the payment of income taxes allegedly owed for the years 1979-1985, citing violation of 26 U.S.C. §7201. To convict Petitioner on Count 17 the government had to prove, (among other things), that he had a "deficiency" in each of the years 1979-1985, as provided in Jury Instruction 33, (Exhibit A).

In addition to the above, in order for Petitioner to be guilty of Code Section 7201, he had to have committed an affirmative act of tax fraud. When a person substantially under reports the amount of income taxes he (allegedly) owes on his tax return, he has committed an affirmative act of tax fraud, a felony. But since the government claimed that Petitioner filed no tax returns for the years at issue, (1997-1985), Petitioner could not have committed an affirmative act of tax fraud as described above. The only violations of alleged income tax laws that Petitioner could be charged with violating are failure to file and failure to pay income taxes as referred to in 26 USC §7203. These omissions only constitute misdemeanors under that statute. So apart from Petitioner not being in violation of Count 17 based upon the deficiency issue, he also could not have been lawfully indicted for this reason as well.

2

Finally, Counts #18-23 charged Petitioner with allegedly filing false and fraudulent personal income tax returns for the years 1997-2002, citing 26 U.S.C. §7206 as authority.

Following a 23-day trial before United States District Court, District of Nevada Judge Kent J. Dawson, and a jury, Petitioner, who represented himself at trial, was convicted on all counts. On February 24, 2006, Judge Dawson sentenced Petitioner to 151 months imprisonment, to be followed by a 12-month consecutive sentence for contempt of court.

Petitioner filed a timely Notice of Appeal, raising six issues: (1) the Petitioner's competency to stand trial, declaring that his waiver of counsel was not knowing or voluntary; (2) the abuse of judicial discretion holding Petitioner in contempt of court; (3) the substantive reasonableness of the sentence; (4) the refusal of Judge Dawson to recuse himself despite his stated accusations that he held Petitioner responsible for threats made against him by third parties; (5) the insufficiency of the evidence; and, (6) the fairness of Petitioner's trial based on the district court's 17-month delay issuing a final Order on four pre-trial motions, and, the judge's disparaging remarks made against Petitioner repeatedly throughout the trial.[1]

On December 26, 2007, The Ninth Circuit Court of Appeals issued three opinions on the case, one precedential, (U.S. v. Cohen, 510 F. 3d 1114), and two non-precedential, (U.S. v. Schiff, No. 06-10199 and No. 06-10201), which rejected all but one of the Petitioner's issues. The precedential opinion addressed the Petitioner's challenge to the district court's contempt citations. The court found this issue meritorious, vacated the contempt convictions and remanded the case to "allow the district court to file the requisite contempt orders pursuant to the Federal Rules of Criminal Procedure 42 (b). On September 5, 2008, the district court reinstated

the findings of contempt and imposed a total sentence of 11 months rather than the original

Order imposing 12.

Pursuant to those findings, Petitioner filed a Petition for Writ of Certiorari, which the

Supreme Court denied on November 1, 2010. [2]

On July 14, 2009 when the second appeal from the contempt orders was still pending,

Petitioner filed a Motion pursuant to 28 U.S.C. §2255 to vacate his conviction and sentence. The

prosecution moved to dismiss that motion without prejudice, because the Petitioner's judgment

of conviction had not yet become final. Petitioner opposed the Government's motion but the

district court never ruled on it.

On October 31, 2011, Petitioner filed an amended motion pursuant to 28 U.S.C.

§2255 raising the issue of ineffective assistance of counsel on direct appeal based on Petitioner

counsel's failure to challenge: (1) the district courts granting of a government *motion in limine*

to exclude evidence of Petitioner's bipolar disorder; and (2) the district court's exclusion of

numerous witnesses, documentation and other evidence that Petitioner sought to introduce in

support of his defense and showing that he did not willfully violate any laws. (This was an error

on the part of Petitioner's appellate counsel. In truth Petitioner's defense was not that he did not

"willfully" violate any laws, but that in fact he did not violate any laws, willfully or otherwise.)

On September 21, 2012 the district court denied Petitioner's amended §2255 motion.

In an unpublished decision on November 7, 2013, the Ninth Circuit Court of Appeals

denied Petitioner's §2255 Motion (U.S. v. Schiff No. 12-17712, DC No. 2:04-CR-0019-1-KJD).

In doing so it had no problem misstating both law and fact and applying the same fraudulent

logic as shown in endnote #1. However, Petitioner's attorney made the court's task much easier as he raised both issues inaccurately, while refusing to raise other issues that were equally as formidable, such as the issues being raised in this §2241 Petition.

Petitioner never realized how totally ineffective and irresponsible his attorneys were until they filed their Opening and Response Briefs to his §2255 Motion; but by then it was too late to hire another attorney. For a more comprehensive account of the ineffectiveness of Petitioner's attorneys, see pages 36 to 38 in connection with Petitioner's Sixth Amendment Right to be represented by effective counsel.

Therefore, on January 21, 2014 Petitioner filed a motion *Pro Se* seeking an *en banc* re-hearing of the 9th Circuit Court's denial of his §2255 Appeal. On February 12, 2014 the court denied Petitioner's request. (U.S. v. Schiff No. 12-17712, D.C. No's. 2:09-cv-01274-KJD; 2:04-cr0019-KJD-LRL-1). In so doing the 9th Circuit stated, "No judge had requested a vote to hear the matter following *the en banc* denial." So his motion was denied.

Because of the ineffectiveness of Petitioner's attorneys, he was compelled to file his Petition for Writ of Certiorari *Pro Se*. Petitioner is legally blind and can only intermittently read with great difficulty using a large magnifying glass, (which was provided to him by this institution). Therefore, he was wholly dependent on other inmates, who either worked in the prison's law library or used it for their own legal purposes, to help him type his initial drafts, which he would then edit with a black marker. However, (as is the case here), the final editing and completion had to be left to others outside this institution with access to word processors, relevant court decisions, and the ability to locate the needed supporting exhibits.

Unfortunately, the Petitioner even had difficulty getting to the law library to work on his Petition. The prison has "controlled movements on the hour," which greatly restricted his ability to utilize the library, even when it was open. In addition, access is shut down completely when the compound is "on Lockdown" for any number of reasons, such as: inclement weather, when an ambulance is on the premises, staff meetings, and unscheduled "call-outs." Further, Petitioner must also attend numerous medical call-outs due to his medical conditions – many of which are common to people who are in their late 80's. In fact, the Petitioner was transferred to Fort Worth F.C.I. precisely for its ability to handle "long-term care" for such inmates. Petitioner has suffered a series of blood clots and circulatory problems requiring medical treatments and hospitalization interfering with his ability to work on his own litigation.

The law library has a file on petitioning the Supreme Court, which included the forms for doing so. Petitioner assumed that the librarian would know when a timely request for an enlargement of time had to be filed. On May 22, 2014, Petitioner filed a motion for an enlargement of time, seeking to extend the deadline to June 17, 2014 for appealing the Ninth Circuit Court's Order on (28 USC §2255) the petition for habeas corpus relief.

Since by June 10, 2014 Petitioner had not received any response with respect to this Motion, he became concerned as to whether the enlargement of time had been granted. On that date, the individual who was working on the final draft of his petition called the Supreme Court, and was told that the court had not yet received the Motion. Therefore the Petitioner checked with the prison's postal department and verified that his letter to the Supreme Court had been postmarked and mailed on May 22nd. Since it had not been returned to the prison, Petitioner was sure that the Court would eventually receive and grant the extension. Based on that

6

assumption, Petitioner completed the petition and sent it, together with numerous supporting

exhibits, to the Supreme Court. Five pounds of material was sent to the Court on June 14, 2014.

However, on June 29, 2014 Petitioner received the attached letter from the Supreme

Court, informing him that they never received a timely request for an extension. (The two dates

in its letter were incorrect). It was then that Petitioner was first made aware that his Motion For

An Enlargement Of Time had been filed nine days too late. Petitioner then sent a letter to the

Supreme Court attaching an entry from the prison's mailroom log showing the Motion

postmarked on the 22nd of June (not on the dates indicated in the Court's letter of denial).

Unfortunately this did not persuade the Court that Petitioner's Motion had been filed in a timely

manner. This leaves the current §2241 Petition as Petitioner's sole remaining remedy to cure his

wrongful imprisonment. See Exhibits 6 and 6-a, where Petitioner has included the two letters

sent him from that Court.

## ARGUMENT

I.    PETITIONER CANNOT BE GUILTY OF COUNT 17 (INCOME TAX EVASION
      PURSUANT TO 26 U.S.C. §7201) AS A MATTER OF LAW, FOR WHICH HE
      RECEIVED A SENTENCE OF 5 YEARS AND FOR WHICH HE IS CURRENTLY
      INCARCERATED.

Pursuant to Jury Instruction 33, (Exhibit 1), and, transcript page, (hereinafter referred to

as "TP"), 5070, included as Exhibit 2, in order for Petitioner to be guilty of Count 17, (Tax

Evasion), the government was required to prove that a "deficiency" existed in each of the years

1979 -1985. Therefore, if Petitioner can show that no deficiency existed in even one of those

seven years, this Honorable Court would be required to vacate the sentence imposed pursuant to

Count 17, and Order Petitioner's immediate release from incarceration.   However, as the following will show, Petitioner will prove conclusively, based on the testimony of the government's key witness on this issue that no deficiency existed for the year 1984.   And also based on government documents, the Petitioner will prove conclusively that no deficiency existed in any of the years (1979-1985) as charged in Count 17.

Direct evidence regarding the existence of "deficiencies" in any of the years at issue, should have been provided by Internal Revenue Service investigative aide Kristy Morgan, who was called as the Government's sole witness on this issue.   At TP 1541, (Exhibit 2-h), the government prosecutor asked Ms. Morgan to explain the entries on Petitioner's 4340 Form for the year 1984. (A "4340" is the I.R.S.' official form that contains a record of a taxpayers activities for that year.)   (Exhibit 9).   At TP 1542, (Exhibit 2-i), she pointed out, among other things that:

> "The very first item shows the date of August 8, 1991. There was a prompt assessment made...the amount assessed was $5,567..."

At TP 1543, (Exhibit 2-j), the witness testified:

> "the estimated tax penalty of $350; an additional tax assessment by exam was <u>nothing,</u> additional tax assessed by default letter, which is <u>the 90 day letter</u>, was nothing..." (emphasis added)

The "90 day letter" refers to the letters sent by the I.R.S. notifying taxpayers that a deficiency exists in the tax they reported on their returns.   The "90 days" refers to the length of time that the taxpayer is allowed to petition Tax Court to contest the alleged deficiency.   Failure to do so within that period will cause the deficiency to be assessed. But Ms. Morgan specifically

testified that Petitioner had no deficiency for the year 1984, and she did not testify, (nor did any other government evidence establish), that a deficiency existed for Petitioner in any of the years from 1979-1985.

Pursuant to law, in order to sustain Petitioner's current imprisonment with respect to Count 17, the government had to prove that Petitioner had a deficiency in each of the years from 1979-1985.   Ms. Morgan's testimony that the Petitioner had no deficiency for 1984 automatically vacates Count 17, even if Petitioner proves nothing further on this issue. Ms. Morgan's testimony would require this Honorable Court to order Petitioner's immediate release. (Without the five-year sentence attached to Count 17, the Petitioner would have completed the imprisonment portion of his sentence two years ago).   However, Petitioner will show, based on government documents, no deficiencies existed in any of the years 1979-1985.

## II.     WHAT IS A DEFICIENCY AND HOW DOES IT ARISE?

Considering the fact that at trial Judge Dawson delivered a totally false jury instruction, (No. 34, Exhibit 1-a, and, TP's 5070-5071, Exhibits 2 and 2-a), concerning what a deficiency is and how it arises, and since Treasury Regulation 301.6211 totally contradicts the statute that it supposedly implements, (as well as numerous other statutes, as will be shown below), and, given how crucial an understanding of the concept of "deficiency" is to his defense, Petitioner is compelled to clearly establish the correct nature of a deficiency and how it arises.

I.R. Code Section 6201 (a) (1) states as follows:

> The Secretary shall assess all taxes determined by the taxpayer or by the Secretary as to which returns or lists are made under this title.

Therefore, unless the taxpayer files a return showing an amount determined by him to be due and owing, no tax assessment can be made. (The "tax determined by the Secretary" refers to returns prepared by him pursuant to Code Section 6014 when the taxpayer elects to have the Secretary prepare a return from information supplied to him by the taxpayer.) Internal Revenue Code Sections 6204 and 6211 support this. The amount reported by the taxpayer will be automatically assessed pursuant to I.R. Code Section 6201 (a) (1). However, the I.R.S. may subsequently determine that the taxpayer underreported the amount of tax as shown on their return and will therefore notify them that a "deficiency" arises pursuant to Code Section 6204, which provides (in relevant part) that:

> "The Secretary may make a supplemental (i.e. deficiency) assessment whenever it is ascertained that any assessment is imperfect or incomplete in any material respect."

Section 6211 defines a deficiency, in pertinent part, as follows:

> "The amount by which the tax imposed...exceeds the excess of (1) the sum of (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer, and an amount is shown thereon."

Clearly therefore a deficiency cannot exist if the taxpayer does not file a return "showing a tax thereon."

It is clear that there cannot be a deficiency assessment unless a prior assessment is deemed to be "imperfect or incomplete." Code Section 6214 states in relevant part:

> "The Tax Court is authorized to re-determine a deficiency."

Therefore, the Secretary is only authorized to "determine" a taxpayer's deficiency. Neither the Secretary, the I.R.S., nor the Tax Court, is authorized to "determine" a taxpayer's

total tax. There is no I.R. Code Section that authorizes any federal employee to "determine" a taxpayer's total tax, if the taxpayer fails to file a return. If the Government wants to collect income taxes from such a person its only legal recourse is to sue that person in federal court, pursuant to Code Section 6501 (c) (3).

However, the above statutes were disregarded by Judge Dawson in connection with his Jury Instruction No. 34, which states, in relevant part:

> "As to Count 17, a tax due and owing may be ascertained in three ways: by the taxpayer reporting the amount of tax due and owing; by the (Commissioner) examining the taxpayer and assessing the tax; or if the taxpayer fails to file a return, and the Government can prove a deficiency, the deficiency arises the date the return was due."

Thus in each of the Court's three examples as to what constitutes a "deficiency", Judge Dawson could have only been describing a person's total tax, not a "deficiency," since in none of those examples would a prior assessment have been made. No assessment would have been "imperfect" or "incomplete," as provided by Code Section 6204. Therefore, the jury could not have convicted Petitioner of having a deficiency in any of the years 1979-1985 because, based on the Court's definition of a deficiency, not one member of the jury could have had the vaguest idea of what constitutes a deficiency and how it arises.

With respect to Treasury Regulation 301.6211-1 (a):  It has long been held that implementing regulations must be "in harmony" with the statutes they implement. If not, the regulation is void, (see Exhibit 3).

Obviously secretaries of executive agencies have no authority to change laws written by Congress or undermine them by issuing contrary regulations. But taxpayers are unaware when a

void regulation with no legal effect is used against them. However, attorneys representing taxpayers will not raise this issue for a variety of self-serving reasons.

Treasury Regulation 301.6211-1 (a) states as follows (in relevant part):

> "If no return is made, or if the return does not show any tax, for the purpose of the definition, 'the amount shown as the tax by the taxpayer upon his return' shall be considered as zero."

The statute itself makes clear that a deficiency can only arise if a return is filed "showing a tax thereon." Here the regulation states that a deficiency can arise even if no return is filed, or if one is filed even if it shows no tax "thereon". So the regulation totally stands Code Section 6211 on its head and in so doing makes an assumption contrary to fact. But in addition, when the I.R.S. "determines" an alleged "deficiency" in this manner, it will not have reduced the "alleged deficiencies" by an amount previously assessed. Therefore, what the regulations will claim as a "deficiency" will in reality be the individual's total tax. So not only is this regulation void, since it blatantly contradicts the statute it supposedly implements, but it is also contrary to Code Sections 6201 (a) (1), 6204, 6211, 6214, and 6501 (c) (1) and (c) (3).

Pursuant to Code Section 6501 (c), the only taxes that can be assessed without returns are excise taxes, because in order to assess income taxes, (pursuant to section 6201), the I.R.S. would have to have a return. So, in reality, Treasury Regulation 301.6211 was designed to unlawfully circumvent the provisions of Code Section 6501(c).

Taxes that can be assessed without returns only apply to excise taxes as provided in Code Section 6201 (2) (A), as shown on page 61 of The Federal Mafia, (Exhibit 7). However no comparable provision is made in the I.R. Code with respect to income taxes.

III.    REDUCING PETITIONER'S ASSESSMENT TO JUDGMENT

Appended as Exhibit 8 is the Government's 5-page ruling reducing Petitioner's assessments and penalties to judgment. Included in the document is a Declaration by Revenue Officer Sandra Davaz wherein she shows the assessments of taxes, penalties, and interest allegedly owed by the Petitioner for the years 1979-1985. The Declaration also shows the dates that the assessments were made. However her Declaration shows that all the assessments were based on a singular assessment, not two. But, as Petitioner has already shown, in any year that a deficiency occurs two assessments are required to be made: one pursuant to Section 6201 (a) (1) and another pursuant to Sections 6204 and 6211. Based on the single assessments shown on her Declaration, Petitioner could not have had any deficiency in any of the years 1979-1985. Thus again, Petitioner has proven that he could not be guilty of Count 17, the Count at issue here.

IV.     GOVERNMENT CLAIMS ASSESSMENTS WERE MADE WITHOUT RETURNS BEING RECEIVED

Petitioner has included as Exhibit 9 all of the I.R.S. Form 4340's he has in his possession, and, they are for the years 1979, 1981, 1982, 1983, and 1985. Notice that none of the assessments shown on these documents were shown as being based on returns that were received from Petitioner. Therefore all the assessments shown on these 4340's, (and those shown on Ms. Davaz' Declaration), are all nullities, since pursuant to Section 6201 (a) (1) all assessments must be based on returns that "are made." While Petitioner does not have a copy of his 4340 for the year 1984, Ms. Morgan's testimony established that no deficiency existed in 1984. Since the assessment as shown for the year 1980 on Ms. Davaz's Declaration was made on the same date as shown for all of the years from 1981 to 1985, we can reasonably assume that no return would be shown on Petitioner's 4340 for 1980 as well.

Therefore all of the tax assessments shown on Petitioner's 4340 for 1980 -1985, as well as all the taxes, penalties, and interest charges shown on Ms. Davaz' Declaration, are all nullities, since none were based, by the Government's own admission, on tax returns that "were made" as required by Code Section 6201 (a) (1).

WITH RESPECT TO 1979

The first entry on Petitioner's 4340 for the year 1979 is:

"1-21-84 RETURN FILED & TAXES ASSESSED   $0.00   05-20-1985."

All of these entries are false and fraudulent. Included in Exhibit 10 is the "Substitute" return that the I.R.S. made in connection with Petitioner's 1979 taxes. However there is no section in the IR Code that allows the Secretary (let alone the I.R.S.) to prepare substitute returns for individuals who file no income tax returns. Section 6201 (a) (1) specifically requires that assessments be made from returns filed by the taxpayer. It does not state that assessments can be made from "substitute returns", (sometimes referred to as "dummy returns"), prepared by the I.R.S.. In addition, Section 6203 states (in relevant part) that:

> "assessments shall be made by recording the liability of the taxpayer in the office of the Secretary [emphasis added]"

Since as of 5/20/1985 the government claimed that Petitioner had no tax liability, therefore the Government had nothing to record! Obviously Section 6203 does not permit the Secretary to record as a tax a liability the absence of one.

The next entry shows a "quick assessment" of $44,149.99, which reflects the IRS' attempt to pass off a "quick assessment" as a "deficiency". But since a deficiency requires that

14

two assessments have to be recorded on Form 4340, the I.R.S. made a "zero" assessment in order that two assessments can be fraudulently shown on a taxpayer's 4340.    Therefore the $44,199 is Petitioner's <u>total tax</u> and not a deficiency.  However, since Petitioner filed no return for 1979, the Government's only recourse to collect any income taxes from him for that year would have been to "institute a lawsuit" as required by Code Section 6501 (c) (3). The fraudulent entries on Petitioner's 4340's were designed to allow the I.R.S. to unlawfully circumvent Code Section 6501 (c) (1) and 6501 (c) (3).  If those sections allowed the I.R.S. to make assessments without a return, the I.R.S. would have no need to prepare substitute returns.

When Petitioner contested his alleged deficiency in Tax Court, he pointed out to the judge conducting the hearing that he was seeking to "determine" Petitioner's <u>total tax</u>, not seeking to "re-determine" his alleged deficiency. The judge ignored this obvious distinction, sustained the fraudulent deficiency, and sanctioned Petitioner an additional $25,000 for having the temerity to correctly point out to him why the judge had no legal authority to conduct the hearing for which he was engaged. So much therefore for the "impartiality" that Tax Court judges are supposedly required to have since taxpayers are not afforded the protection of impartial juries.

Therefore all of the entries in Ms. Davaz' Declaration that show a "balance" that Petitioner allegedly owed in the amount of $2,651,187.50 were all fraudulent, since according to the Petitioners 4340's none of those entries were based and supported by tax returns as required by Code Section 6201 (a) (1). In addition, in her footnote on page 3, she notes that the "balance" in question had been reduced due to payments applied to the Petitioner's account for the years 1979 and 1980.  Those "payments" were, in reality, seizures made by I.R.S. agents who have no

15

statutory or delegated authority to enforce income tax payments by distraint. To effect those unauthorized seizures, I.R.S. agents employ fraudulent and benign "notices of levy," which can only apply to the accrued wages and salaries of federal employees (see Code Section 6331(a)).[3]

The 5th Amendment to the U.S. Constitution provides that no person shall be deprived of life, liberty or property without "due process of law." All of the above tragically illustrates how the executive branch of the federal government makes a mockery of this provision.

On the basis of Kristy Morgan's testimony alone during the criminal trial, this Honorable Court is required to order Petitioner's immediate release. Despite the incontestability of Petitioner's issues raised regarding Count 17, there are still at least 7 grounds that should have resulted in the reversal of Petitioner's conviction because of the fraud committed by the prosecutors including their failure to effectively respond to the issues Petitioner raised.

FURTHER GROUNDS FOR REVERSING PETITIONER'S CONVICTION

1). The district court denied ruling on Petitioner's four pre-trial motions challenging the court's jurisdiction for 17 months and finally communicated its Final Order to Petitioner only a few short days before commencement of the criminal trial. It did so delay in order to deny Petitioner his "due process" 5th Amendment right to file interim appeals with respect to each motion. This deliberate violation of Petitioner's due process rights provided sufficient grounds to reverse Petitioner's conviction, had his attorney's included this issue in his §2255 Petition and Appeal.

2). In the district court's three page Final Order addressed to these four pretrial motions, (as shown in Exhibit 14), challenging the court's jurisdiction on four separate grounds, the court lists

three reasons for rejecting all four of Petitioner's motions challenging its jurisdiction. None of these reasons were contained in the government's reply to these four motions, nor were these reasons contained in the Magistrates "R and R". As this Honorable Court can see, these three reasons are irrelevant, without merit and do not address any of the issues contained in Petitioner's four motions.  As a result Petitioner's four motions must prevail and establish that the trial court had no jurisdiction on various grounds to prosecute Petitioner for purported criminal violations of our alleged income tax laws.  When a court's jurisdiction is challenged, it has the burden of establishing its jurisdiction, "by a preponderance of the evidence". Obviously the court's three reasons did not meet its burden. Therefore, the Petitioner's four motions questioning the jurisdiction of the court for prosecuting Petitioner on alleged income tax crimes went un-refuted by the district court and provided grounds for reversing Petitioner's conviction had his attorney's included this issue in his §2255 Petition.

3).     The prosecutor's deliberate misrepresentation of "the Long decision" in order to mislead the jury regarding the validity of Petitioner's zero return provided sufficient grounds to reverse Petitioner's conviction if his attorneys had included this issue in his §2255 Petition.

4).     The prosecutor's numerous false and irrelevant, but highly prejudicial, statements to the jury in his "final summation", none of which were attributed to the testimony of any witness at Petitioner's criminal trial, provided sufficient grounds to reverse Petitioner's conviction if his attorneys had included this issue in his §2255 Petition.

5).     Petitioner repeatedly testified, (without contradiction from the prosecutors), that compliance with income tax statutes was "voluntary" (See Exhibit 2-l through 2-l page 6, TP's 286-287, 483, 2023, 2313, and, 2326).  Therefore, the prosecutors were determined to claim that

Petitioner was wrong and that compliance with income tax statutes was "mandatory and not voluntary". However all Treasury Department documents on this issue state that such compliance is "voluntary", and never do they claim that "compliance" is "mandatory".   In addition, the Supreme Court held that such compliance was voluntary as well as numerous I.R.S. commissioners and other tax officials.  Pages 11 through 18 of <u>The Federal Mafia</u> , (Exhibit 7 to 7-j), produces examples where the Supreme Court, all Treasury Department documents, statements of numerous I.R.S. Commissioners and other tax officials claim that "compliance" is "voluntary" not "mandatory".  Despite this the prosecutors were determined to mislead the jury on this issue and have them believe that such compliance was "mandatory" and not "voluntary". They had a problem of course: they couldn't claim that such compliance was "mandatory" since that would directly contradict all of the above official pronouncements. So the prosecutors sought to resolve their dilemma by contriving the term "optional".   They told the jury that compliance with such revenue laws is not optional.  So the jury is presumed to believe that since such "compliance" was not "optional", that the public had no choice but to comply with such statutes.  Presumably, therefore, compliance was obviously "mandatory".  On TP's 5120 and 5121, (Exhibit 2-k), Mr. Ignall works to insure that the jury was totally deceived on this issue. Mr. Ignall claims that compliance with income tax statutes is not "optional" meaning, of course, that the public has no "option" in connection with the payment of income taxes… i.e. they are required to pay. To impress the jury on how foolish is the belief that income tax payments are voluntary, on TP 5120 Mr. Ignall states that:

> "The idea that taxes are optional—well, how anyone might like to believe that or—or think that could be true—is so outlandish and preposterous that it would be very hard to hold that belief in good faith."

Therefore, Mr. Ignall's claim is that Petitioner's professed belief that the payment of income tax is voluntary so "outlandish and preposterous", and, that Petitioner could not possibly hold that belief in "good faith".

Such a claim obviously cast doubts about Petitioner's honesty and sincerity regarding all of Petitioner's professed beliefs that support his defense. Therefore, such a manufactured and totally false and fraudulent claim provided sufficient grounds for reversing Petitioner's conviction had his attorneys raised this issue in his 2255.

6).    As already shown herein, (page 15), substantial funds were illegally seized from Petitioner by a number of fraudulent and illegal actions, one of which was the government's admission that the seizures involved years in which the government claimed it received no income tax returns from Petitioner.

The 5th Amendment to the U.S. Constitution states, in relevant part, that:

"No person shall be deprived of…property without due process of law".

This of course means pursuant to a court order. However all of Petitioner's funds were seized without a court order being issued. Therefore, such a blatant violation of Petitioner's 5th Amendment right provided sufficient grounds for reversing Petitioner's conviction had his attorneys raised this issue in his 2255, (while also demanding a refund of all the illegally seized funds).

7).    In addition; Senate Report 1622 and House Report 1337 (2nd session), (as shown in Exhibits 15 and 15A), were issued simultaneously with the Income Tax Act of 1954. These reports specifically held that:

"The word "income" as used in IR Code section 61(a) was used in its constitutional sense."

Since Petitioner received no income in its constitutional sense, (i.e. income that is "separated from its source"), as reflected when a corporation reports its "taxable profit", it never reports its profits as "taxable income". Petitioner had no taxable income to report; therefore, he could not have violated any income tax statute. This documentary evidence provided irrefutable grounds for reversing Petitioner's conviction, if only his attorneys had included this issue in his 2255.

Apart from all of the above, meaning my focus on Count 17, the government's fraudulent and illegal actions and its failure to address issues raised by Petitioner resulted in no less than seven grounds for reversing Petitioner's entire conviction.

## V.     PETITIONER'S CONVICTION VIOLATED HIS FOURTH AMENDMENT RIGHTS

Article IV of the Bill of Rights states that Americans have:

A right to be "secure in their persons, houses, papers, and effects, against all unreasonable searches and seizures," and that "no warrants shall be issued but upon probable cause supported by oath and affirmation particularly describing the thing to be seized." (emphasis added).

In February of 2003, ten I.R.S. Special Agents invaded Freedom Books, the Petitioner's place of business, ordered all employees out of the building, and carted away approximately 14,000 documents. The warrant was issued based on the application of a special agent whose job description did not include the authority to apply for such a warrant.

Among other things, they wheeled out two filing cabinets from Petitioner's office containing working litigation files, (involving the civil assessments case between Petitioner and the D.O.J.), income tax research material, and, personal and business records of Petitioner. (Since Petitioner

operated Freedom Books as a sole-proprietorship, all of his business records were personal.) The filing cabinets also contained approximately 200 client files. Since each client file contained at least 10 pages of material, this alone amounted to at least 2,000 documents, not one of which was "particularly designated" as required by the Fourth Amendment. The agents took many documents that could have had nothing to do with any alleged criminal activities Petitioner could have engaged in, (including the entire trial transcript of his 1985 prosecution).   Of these thousands of seized documents, not one was "particularly described" as required by the Fourth Amendment.

In addition, (enclosed as Exhibit 11), from the <u>Internal Revenue Manual</u>, Organization and Staffing Manual, an excerpt shows the authority of I.R.S. Special Agents.   Notice that paragraph 1132.75 is entitled: "Criminal Investigations Division", which refers to special agents states (in pertinent part) as follows:

> The Criminal Investigation Division enforces the criminal statutes applicable to income... tax laws...involving United States citizens residing in foreign countries and non-resident aliens subject to Federal income tax filing requirements."

Since Petitioner does not fall into either category, the special agents had no lawful authority to apply for the search warrant nor did they have requisite authority to conduct the raid on Freedom Books. These restrictions on special agents that appear in the Staffing Manual are also contained in the job descriptions that each special agent is required to maintain on his person. Based on the irrefutable evidence that the special agents seized documents in a manner inconsistent with the Fourth Amendment's "particularly described" requirement, and that the special agents themselves were not even authorized to conduct such a raid, Petitioner filed an iron-clad motion to suppress the documents and information illegally obtained in the seizure.

(Petitioner also demanded an immediate return of the 14,000 seized documents). The District Court denied Petitioner's motion, thereby throwing the law and the Constitution out the window.

VI.    PETITIONER'S CONVICTION VIOLATED HIS FIFTH AMENDEMENT RIGHTS

Apart from the "due process" violations already presented in this petition, they are all pale when compared to the following "due process" violation.

In United States v. Hill, 123 U.S. 681, 8 S. Ct. 308 (1887), the Supreme Court stated:

The term "revenue law" when used in connection with jurisdiction of the Courts of the United States means a law which is directly traceable to the power granted to Congress by Article 1 Section 8 of the U.S. Constitution to "lay and collect taxes, duties, imposts, and excises".

On March 30, 2004, (or approximately 2 weeks before his arraignment), Petitioner filed a motion requesting dismissal of all 13 counts charged in the indictment since they all alleged violations of income tax statutes which are not "traceable" to Congress' power to tax. The District Court delayed ruling on this motion, (and three other motions that challenged jurisdiction), for 17 months, or until August 31, 2005, but the Court delivered its rulings to Petitioner only a few days before his trial began which was on September 13, 2005.

Petitioner supported his eight page motion with extensive quotations from the following additional Supreme Court decisions, none of which have ever been reversed or overturned: Pollock v. Farmers Loan and Trust (1985), Stanton v. Baltic Mining (1915), Brushaber v. Union Pacific Railroad (1916), and, Eisner v. Macomber (1920).

In addition, Petitioner pointed out that the Ninth Circuit's decision in Becraft v. Wilson, 1989, (which both the government and the Magistrate sought to rely on in their replies), was contrary to all the Supreme Court decisions listed above. Those decisions held that:

1) The 16th Amendment did not give Congress any new taxing power, and that its constitutional power to "lay and collect taxes" was still limited to the Constitution's three taxing clauses and to the two "great classes" of taxes it provided for: direct taxes and indirect taxes.

2) All direct taxes had to be imposed on the basis of apportionment, while all indirect taxes, (identified in the Constitution as "duties, imposts, and excises"), had to be imposed on the basis of geographic uniformity.

3) The definitive Brushaber Decision stated that an: "Income tax was in its nature an excise tax, entitled to be enforced as such."

Since the income tax is neither imposed as a direct tax, (not apportioned), nor as an excise tax, the Brushaber Court held: the tax is obviously not "traceable" to Congress' power to impose taxes.

Obviously, Petitioner has a constitutional right not to be compelled to pay a tax that Congress has no constitutional power to impose or enforce. Therefore no American can be imprisoned on greater illegal grounds than is Petitioner's current imprisonment. How could Petitioner be deprived of a more fundamental Fifth Amendment right than this?

Petitioner has also included, (in Exhibit 13), his 8-page Memorandum To Dismiss for want of jurisdiction based upon the issue that the income tax is not directly traceable to Congress' constitutional power to lay and collect taxes; and, also included, (Exhibit 14), is the

District Court's three-page denial of Petitioner's motion. That court essentially gave three reasons for its denial. However, this Honorable Court can easily see that its first two reasons are wholly without merit, while its third reason, (based on an alleged "incredible assumption"), is irrelevant (notwithstanding that the assumption itself may be correct).

While the income tax was imposed unconstitutionally from 1915 to 1954 (for reasons Petitioner need not cover), its unconstitutionality was corrected with the Tax Act of 1954. In that Act Congress removed:

1) All of the enforcement provisions that were in the 1939 Code. (For example, section 22 of the 1939 Code contained the provision that; "the income tax shall be laid, collected and paid." No such provision appears in Subtitle A of the 1954 Code.)

2) All material reference to the I.R.S. Commissioner, (and thus to the I.R.S.), were removed from the 1954 Code but the 1939 Code referred to the Commissioner numerous times.

3) And concurrent with the passage of the 1954 Act, Congress issued two reports: Senate Report 1622 and House Report 1337 (83rd Congress, 2nd Session). On pages A18 and 168 of those reports, respectively, (included in Exhibit 15 and 15-a), Congress pointed out that the definition of income, as used in the 1954 Code, is based on the 16th Amendment and that the word "income" is used in its constitutional sense.

Obviously, if the word "income" as used in Code Section 61 (a) is defined as "income" in its "constitutional" sense, this must have a significantly different meaning than what the word "income" means in its "ordinary" sense. Unfortunately the two reports do not define what "income in the constitutional sense" means. But as stated in the previously listed Supreme Court decisions, "income" has to be "separated from its source". Otherwise, the tax is on the "source" and not on "income" from the source

generating the "income." However, the only place where "income" is separated from its source is when a corporation calculates its taxable income. If a corporation has income from such sources, (such as dividends, fees, sales, interest), but no profit, then it does not pay any income taxes on such sources. Since Code section 61 does not make a distinction between individuals and corporations, "income" has to mean the same for both. So "income" in its "constitutional" sense can only mean a corporate profit.

The clearest and most precise confirmation of this appeared in the Supreme Court's 1921 decision, Merchant Loan and Trust v. Smietanka, (255 U.S. pages 509, 518, and 519), which states:

> "There would seem to be no room to doubt that the word (income) must be given the same meaning in all of the Income Tax Acts of Congress that was granted to it in the Corporation Excise Tax Act of 1909, and what meaning is has now become definitely settled by decisions of this Court."

This decision was cited and quoted on all of Petitioner's zero returns.

Since the income tax is not imposed in accordance with any of Congress' constitutional taxing powers, in order to impose the tax constitutionally, the 1954 Code made compliance with the individual income tax voluntary. (See Treasury Regulation 26 CFR §601.602 (a)).

Obviously, neither federal courts nor the Tax Division of the Justice Department apply the above definition or the treasury ruling in their administration of the income tax.

## PETITIONER'S CONVICTION VIOLATED HIS SIXTH AMENDMENT RIGHTS

The Sixth amendment provides, among other things, that an accused has a right:

> "to be confronted with the witnesses against him... and to have the assistance of counsel for his defense."

The government put on no witnesses who testified that Petitioner's zero returns were false, (let alone that he believed them to be false), as charged in 12 of the 13 counts of the indictment. Nor did the government put on any witnesses who testified that Petitioner had deficiencies in each of the years 1979-1985 which the government had to prove to convict petitioner of Count 17, (see Exhibit 2, TP 5070).

The government put on no witnesses who testified that Petitioner committed any of the alleged crimes as charged in the indictment, therefore, the prosecutors had to find some "witness" to use against Petitioner, or they would be dead in the water. So, they latched on to Connecticut Judge Peter C. Dorsey, who was the judge who conducted Petitioner's 1985 trial. It was at that trial that Judge Dorsey gave a supplemental instruction to Petitioner's hung jury, claiming that the jury could convict Petitioner even if the government did not prove that he committed the alleged crime as charged in his indictment. In connection with that supplemental instruction an article appeared in the February 1987 issue of "The Journal of Taxation", (See Exhibit 16), which stated that Judge Dorsey's supplemental instruction was:

"in direct conflict with a principle that practitioners have thought, until now, to have been settled law for over 40 years, that mere inaction is not sufficient to constitute the felony of tax evasion unless accompanied by some affirmative misconduct."

As this Honorable Court can see, the article went on to say, that the supplemental instruction was "clearly wrong"; and, further concluded that as a result the jury was instructed that it could convict [Petitioner] solely on the basis of conduct constituting only the misdemeanors of failure to file and failure to pay, and not the felony of tax evasion as charged in the indictment.[4]   As a result of that instruction the article concluded that Petitioner was never actually convicted of tax evasion as held at that trial.

In his book The Federal Mafia, published in 1990, Petitioner discussed the significance of the Journal article and gave other examples of fraudulent rulings Judge Dorsey made at his trial; and, essentially concluded that Judge Dorsey was unfit to be a federal judge.

So to punish Petitioner for alleging that claim (and proving it), and, also to interfere with Petitioner's ability to promote his book, Judge Dorsey was determined to get Petitioner re-incarcerated. His plan for doing that was to get Petitioner convicted of violating the terms of his probation. So, he had one of his Connecticut minions write to Petitioner's New York probation officer, urging him to violate Petitioner for not filing tax returns as allegedly required by the terms of his probation. One such letter is shown in Exhibit 17.

Therefore, taking the "bull by the horns", Judge Dorsey arranged for a Connecticut probation officer to file a petition claiming that Petitioner had violated the terms of his probation. Petitioner has included Mr. Medina's two petitions in The Federal Mafia, (as Exhibits 18 and 19). As shown in Mr. Medina's initial petition, Judge Dorsey endorsed it as holding that the "facts set forth in this application are true to the best of (Medina's) knowledge and belief." Judge Dorsey knew that his statement was false. Since he knew that Mr. Medina had never spoken to Petitioner in his life, so how could his petition be based on Petitioner's "conduct and attitude" (as claimed in the opening lines of his petition)?

However, since Petitioner's New York probation officer was satisfied that Petitioner had complied with all of the terms of his probation, he ignored all such letters.

Petitioner's initial hearing was held on May 31st, 1991. Judge Dorsey explained at that time that the matter was a "probable cause" hearing – not a "revocation" hearing. At that hearing, Judge Dorsey discovered that Mr. Medina's petition was false, so he had to terminate the

hearing to allow him to file another petition. However before terminating the hearing, he promised to provide Petitioner with an attorney at the subsequent hearing, as Petitioner requested. A month later Carmelo Medina filed his second petition, and, a month after that Judge Dorsey held the "extended probable cause hearing", on August 1st and 2nd of 1991. However, at that hearing, Judge Dorsey again failed to provide Petitioner with the attorney he promised to provide.

Nothing more was heard by the Petitioner until Friday, November 22nd, 1991, when Petitioner was informed by a phone call from Mr. Medina, that he (Petitioner) was required to appear at a hearing before Judge Dorsey on Monday November 25th. Just coincidentally, on November 20th, 1991, a U.S. Marshall served a federal subpoena on Petitioner ordering him to appear in Houston, Texas on Monday, November 25th to be a defense witness at the trial of Jack Biggers. However, Petitioner did not go to Houston because he was unlawfully intimidated by Judge Dorsey to appear before him on that date even though Petitioner informed his secretary of the subpoena. The next day, on November 26th, Judge Dorsey issued his 8-page ruling claiming that Petitioner had violated the terms of his probation by not filing valid tax returns and sentenced him to an additional 2 years of incarceration, even though Petitioner had already completed his original 3-year term of probation.

Petitioner's hearing on November 25th had to be a revocation hearing in order for Judge Dorsey to issue his ruling on November 26th. Therefore, Petitioner was obviously violated by Judge Dorsey without Petitioner having the revocation hearing as required by law. In fact, no revocation hearing had ever been scheduled. How could Petitioner have had a one-day notice, (overlooking the weekend), to prepare for such an important hearing? In addition, and, again, Petitioner was not provided with an attorney at that hearing. Apart from the fact that Judge

Dorsey's ruling was flat out false, (as shown in Exhibit 19), it also violated Rule 32.1, 18 USC §3006 (A) of the Fed. Rules of Criminal Procedure, which provides that anyone charged with violating the terms of his probation has a right to:

- Produce witnesses in their behalf;
- To cross examine adverse witnesses; (Judge Dorsey never put Mr. Medina on the stand), and,
- To be represented by an attorney.

Judge Dorsey's failure to provide Petitioner with an attorney means that his ruling and his sentencing of Petitioner to two years of additional incarceration was illegal, just on this failure alone.

As could be expected, Judge Dorsey's ruling was fraudulent from beginning to end. However, Petitioner will not waste time and space refuting all of those statements. Suffice it to say that nowhere in his ruling does he mention the Merchant's Loan and Trust decision and why it didn't support Petitioner's claim of having zero income. In addition, throughout his ruling he falsely used the term "income" in its "ordinary sense," when he knew that both the Petitioner and the IR Code used that term in its "constitutional sense" and not in its "ordinary sense". But in addition to this, Petitioner has included hard evidence, (Exhibit 2, m through q: TPs 1642, 1643, 1644, 1676, and 1677), and, Exhibit 19-a, showing that assessments were made from Petitioner's zero returns on December 23, 1990, or approximately one year prior to Judge Dorsey's ruling that Petitioner's returns were "invalid". As shown in the exhibits, all of the returns in question were received and accepted by the I.R.S., processed as "valid" returns, as evidenced by the stamped "document locator numbers". In addition, Petitioner has included in that exhibit, the first two pages of his 1980 return as an example showing that they had been processed by the I.R.S. Service Center in October 1990.

These are important facts as it relates to this case: A return with a stamped "document locator number" means that the return was "processed" as valid returns. Both the District and Appellate Courts (and the prosecutors) continually represented to the jury that Petitioners zero returns were not "valid," a claim that was solely based on the pronouncement of a person - Judge Dorsey – who never made claims on the witness stand where he could be subject to cross-examination concerning his fraudulent and vindictive probation ruling.

However, besides being in violation of the 6th Amendment, the use of Judge Dorsey's probation ruling was in violation of Jury Instructions #2 and #8. (TP 5054, 5055, Exhibits 2-s and t).  Contrary to Jury Instruction #2, Judge Dorsey's claims were not made in the form of "sworn testimony of a witness."  Jury Instruction #8 provides that Petitioner can "only be found guilty of charges in the indictment." Petitioner's indictment did not charge him with filing "invalid" returns.   So not only did Judge Dorsey's ruling violate the 6th Amendment, it contradicted un-refuted trial testimony; it contradicted the Long decision which all 9th Circuit judges were required to follow, and, it was unlawful to boot.

Despite all of the above, Judge Dorsey's Ruling was continually used throughout Petitioners trial to mislead the jury into believing that Petitioner's "valid" returns were invalid".

For example, on TP 747, (Exhibit 2-v), Prosecutor Jeffrey A. Neiman asked special agent Ted Wethje, "What did the Court say to Mr. Schiff with regards to this zero return in 1991?" The witness replied, "Judge Dorsey instructed him that it was not a valid return." So, in this instance Judge Dawson had no problem allowing the jury to hear utterly hearsay testimony that was prejudicial to Petitioner, but, Judge Dawson refused to allow the Petitioner to introduce a letter he received from the Treasury Department, (which can be found on page 17 of The Federal

Mafia, also showing its importance), on the grounds that it was "hearsay," even though the Prosecution had not itself objected to the letter's introduction. How is it that a letter from the Treasury Department addressed to Petitioner be "hearsay"?   This double standard shows a clear lack of impartiality on the part of Judge Dawson, in violation of the "due process" clause of the Constitution, and, as such, should have resulted in a reversal of petitioner's conviction, if his attorney would have raised it in Petitioner's 2255.

At TP 773, (Exhibit 2-w), Judge Dawson charged the jury with the following instruction: "You have also heard evidence that there was a judicial determination at a probation hearing that Schiff filed zero returns that were not valid.  It should not be considered as evidence against the other defendants."  Therefore the jury was effectively told that Judge Dorsey's probation ruling could be considered as "evidence" against the Petitioner.

In reality Judge Dawson was bound by authorities cited and quoted in all of the attachments, which were a part of Petitioner's zero returns.   Long held that a tax return containing zeros in all the spaces provided still constituted a return, even if the information was false.  So instead of entering a ruling that all 9th Circuit courts were required to follow, Judge Dawson unlawfully applied rhetoric during a probation violation hearing that had no precedential value whatsoever and was evidence of nothing.

Some of the questions asked by the Prosecutor Jeffery A. Neiman in his cross-examination of Petitioner, (TP 4810-4812, Exhibit 2-r), are the following:

1. "And you read this order before? You were aware of this order?" (referring to Judge Dorsey's Probation Ruling)

2. "And this order, does it not reject the zero return as a valid return?" (Why didn't the government put on a legitimate witness who would explain to the jury why Petitioner's return was not valid?)

3. "Well you disagree with Judge Dorsey?" (So did the Journal of Taxation, but Judge Dawson refused to allow Petitioner to introduce the article as an exhibit even though he allowed the government to use Petitioner's alleged 1985 conviction against him.)

4. "All right Mr. Schiff, Judge Dorsey in his order called your zero return, did he not, a gimmick? (Why didn't the government put on a legitimate witness to explain to the jury why Petitioner's zero return was a "gimmick" and whom Schiff could cross-examine?)

5. However, Schiff, the rest of this order, does it not, go on to say that you write books about your theories "to the disadvantage of the gullible that follow your recommendations, only to find themselves in trouble with the law? Does that order say that?" (This of course was a statement in the disguise of a question. But what has this got to do with any of the 13 counts in Petitioner's indictment? In addition, Petitioner's books explain his understanding of the law, which any reader can check by referring to the statutes, regulations, and court decisions cited in his research, which is why Petitioner sold the IR Code and even the five volume set of treasury regulations. In addition Petitioner never "recommended" that anyone do anything, based on his record. They could use it as they saw fit. In fact, he even told his readers the danger of actually using the information in his research. (See Exhibit 20, page 167 of The Federal Mafia)

As this Honorable Court well knows prosecutors are only supposed to cross-examine witnesses regarding their direct testimony, but here the prosecutors, taking advantage of Petitioner's lack of trial experience and ignorance, cross examined Petitioner on issues he never raised on direct, such as Judge Dorsey's probation ruling. So when Petitioner began to answer such questioning his stand-by counsel should have immediately asked for a five minute recess, during which time he should have advised Petitioner to object to any such question as being "outside the scope of my direct testimony." Otherwise, what purpose did Petitioner's stand-by counsel serve? Why was he court appointed: to do what? Had he done so, he would have prevented Petitioner from further undermining his defense by responding to such questions in a non-responsive, ineffective and arrogant manner.

Petitioner, in his defense, would point out to this Honorable Court that throughout the trial Judge Dawson used derogatory language against Petitioner and sought in every way to undermine his defense. So to get even, in an act of frustration and rage, Petitioner illogically responded to such questions in a manner that would be interpreted as applying to Judge Dawson as well as Judge Dorsey. For example on TP 2531 and 2726 he refers to Petitioner's understanding of the income taxes as "legal garbage." However, TP 2528 through 2531 are significant since they explain how Judge Dawson reached that conclusion. (These transcript pages are shown as Exhibit 2-x.)

Since the government put on no witnesses at Petitioner's trial who testified on what basis Petitioner committed the 13 Counts as charged in his Indictment, the government, in its "final summation", had no testimony it could review for the jury. Therefore, the Prosecutor David Ignall fell back again on Judge Dorsey's fraudulent and unlawful probation ruling.

At TP 5122, (Exhibit 2-y), he tells the jury in pertinent part:

"In 1991 Judge Dorsey told Mr. Schiff the zero return is not valid. And that's Exhibit 66. On page 4 of Exhibit 66 Judge Dorsey tells the defendant, tells Mr. Schiff, that simply repeating his position doesn't validate it. ... Judge Dorsey said specifically in that order that the zero returns are 'but another gimmick by which to evade taxes' and are not 'filed in good faith.'"

Here the prosecutor is specifically calling the jury's attention to a document that he knows is: false on its very face, and fraudulent on other grounds as previously covered, (See Exhibits 16 – 19-a). This blatantly violates Petitioner's right under the 6th Amendment "to be confronted by the witness against him"; a document that is barred by Jury Instructions 2 and 8 as previously explained; and, was issued unlawfully before being afforded a revocation hearing. But the prosecutor had no witness testimony or other evidence to show Petitioner allegedly violated some federal law.

On TP 5123, (Exhibit 2-y, page 2), the Prosecutor stated in pertinent part:

"Judge Dorsey also talks about the Long decision. That's one of the cases that's cited in that two-page attachment that customers buy from Freedom Books and send to the IRS. Judge Dorsey told Mr. Schiff on page 6 that Mr. Schiff's reliance on Long is convoluted and opportunistic.... That Long decision is still good law, it just doesn't stand for the proposition that Mr. Schiff wants it to stand for. It doesn't say that it's okay to file zero returns when you have income."

Here, Mr. Ignall states what the Long decision "didn't say". Since there is many things that decision "didn't say", anything the prosecutor said that the decision "didn't say" would be correct. But why didn't he tell the jury what the decision "did say"? He didn't do so because he would then have to tell the jury that pursuant to what that decision "said", Petitioner's zero returns were "valid". So here, without actually misstating, Mr. Ignall, (applying a fraudulent semantic device), misrepresents the Long decision so as to fraudulently and deliberately mislead the jury into believing that pursuant to that decision Petitioner's zero returns were "invalid" even though Mr. Ignall had to know they were "valid".

Obviously the court is not going to say, "It's okay to file false returns". The issue in Long was whether a return that inserted zeros in all of the spaces provided, was still a valid return, "even if the information was false."  So here Mr. Ignall deliberately misleads the jury by claiming that Petitioner's zero returns fell outside the Long decision, when Mr. Ignall had to know that pursuant to that decision Petitioner's zero returns were valid returns, while, in addition, being valid returns pursuant to the Supreme Court's 1921 Merchant's Loan and Trust decision, which was another decision cited in Petitioner's zero returns.

In deliberately misleading the jury, (in connection with 12 of the 13 Count Indictment), as to what the 9th Circuit held in the Long decision, (and overlooking the Merchant's Loan and Trust decision), Mr. Ignall violated every principle and ethic that U.S. prosecutors are supposed to uphold. He even violated the Justice Department's lofty motto. In doing all of the above, Mr. Ignall provided sufficient grounds for reversing Petitioner's entire conviction had his attorneys included this issue in Petitioner's 2255.

Transcript pages 5121, 5122, and 5123, (overlooking all the references to Judge Dorsey's Probation Ruling), contain no less than 30 prejudicial accusations and conclusions none of which were attributed to any testimony of any witness at Petitioner's criminal trial. All of these statements represent the prejudicial, self-serving representations of a prosecutor determined to get a defendant convicted as guilty as his alleged function. However, Mr. Ignall presents them as an example of why Petitioner is guilty of the alleged crimes charged in the Indictment. Therefore the prosecutors had no legitimate basis for the statements made in the "final summation". Such a perversion and conversion for the purpose for which a "final summation" is designed to serve, would have provided sufficient grounds to also reverse Petitioner's conviction, had his attorney's included this issue in his 2255.

## Petitioner Did Not Have Effective Assistance of Counsel

In the §2255 Motion, Petitioner's attorneys refused to raise the irrefutable argument contained in this §2241 Petition, as well as other arguments that were equally formidable. The §2255 did not explain how the original appellate attorney was ineffective for failing to mention that the prosecution had utterly failed to prove any of the 13 charges contained in the Indictment.   Incredibly, the only defense raised by Petitioner's §2255 attorneys was that even though Petitioner's beliefs with respect to the income tax was incorrect, he held them "in good faith."

The attorneys took that position because if Petitioner's zero returns were valid, it would contradict everything his lawyers thought they knew about the income tax.  So they chose to defend the Petitioner based on their false beliefs about the income tax rather than on their client's correct beliefs. But their refusal to look past their own understanding of tax law should not have prevented them from easily showing how the government had failed to prove any of the charges in the Indictment.

> "Irwin Schiff's defense at trial was that he had a good faith belief that he was acting in accordance with the law and therefore he lacked the "willfulness" required for conviction."

To what "law" are they referring? In addition, the above statement is false. Petitioner's defense at trial was primarily based on three beliefs that the government never attempted to refute. Petitioner testified at trial, and stated in his numerous motions, that:

1) He could find no law that made him "liable" for income taxes, and the prosecutors did not confront him with any such law on cross examination.
2) Since none of the income Petitioner received was "income" in the constitutional sense, the only form of income that is made taxable in the Income tax Act of 1954, none of it was reportable as taxable income.

3) Compliance with income tax statutes is "voluntary" not "mandatory."

The prosecution's theory was that Petitioner could not have held these beliefs in good faith after he had been told by the I.R.S. and the Courts that these views were incorrect, and after his customers had 'learned the hard way that what he was arguing was illegal.

What have the above statements of the government's "theory" have to do with the government's lawful burden of having to prove that —

1) Petitioner's reliance on the Merchant's Loan & Trust Decision, which was that he could legally report zero income on his tax return, was "false and fraudulent" as charged in 12 of the 13 Counts of his indictment; and,

2) That he had tax deficiencies in each of the years 1979 through 1985 as charged Count 17, the Count at issue here.

If the government had a "theory" with respect to Petitioner's prosecution, it might have been; -- "Since we can't prove any of the charges in Petitioner's Indictment, maybe, with the help of the Court-- we can convict him of other things." If that was the government's "theory" it was a good one, because it worked!

In addition, Petitioner's attorneys knew that in its reply to Petitioner's §2255, the government acknowledged that Petitioner relied on the Pollack and Merchant Loan and Trust decisions to support his belief that he only had "zero" income to report. However, its reply went on to say that the government: "made no attempt to refute Petitioner's understanding of these decisions. (See pages 39 & 40 of the government's Reply Brief in Exhibit 20). (The reason the government made "no attempt" to do so, is because it knew Petitioner's "understanding" of these

decisions were correct.) Therefore Petitioner advised his attorney, (who was drafting the actual documents involved in Petitioner's §2255) that his response to the government's admission need be but one page, in which he asked the government to take "judicial notice" of the government's admission.

But not only didn't he do so, but he managed to convert the government's Admission into a liability on pages 18 and 19 of his Response Brief he wrote:

> Addressing the admissibility of the particular documents the Appellee first claims that the District Court committed no error when it excluded the Supreme Court opinions on which Mr. Schiff said he relied. The Appellee argues that the court did not err. The Appellee implies that in any event Mr. Schiff could have suffered no prejudice since he was permitted to testify concerning his understanding of those cases and since the Government did not challenge the validity of that understanding. However the Government's failure to suggest that perhaps Mr. Schiff had misread the cases made their exclusion from evidence all the more prejudicial. Since the Government did not even attempt to challenge Mr. Schiff's understanding of those cases, there is a reasonable probability that the jury would have blamed Schiff for not corroborating his claims, assuming if they were favorable to him he would have offered copies into evidence, never dreaming that Court had decided to withhold them.

In the final analysis the Petitioner could not have been represented by a more ineffective or irresponsible law firm than the one Petitioner's children hired to prepare their father's §2255. Petitioner's attorney's pertinence at "oral argument" was a total disaster. He not only did not raise the government's Admission, but he failed to use it to correct a false statement made by one of the judges on the 9th Circuits panel. He also told the panel that the Cheek decision applied only to "some" of the Petitioner's tax beliefs, when he should have known and told the panel that the Cheek decision applied to ALL of the Petitioner's tax beliefs.

Petitioner's firmly held beliefs have developed over decades of research and experience, not setting out to challenge the Internal Revenue Service or to bother the courts or to become

known as an income tax protestor.  As an economist and a business owner, Petitioner's core beliefs are grounded in the interest for and concern over the effects of increased federal laws and regulations governing money and banking that have, over the years, worked to destroy America's industrial base.  The theme of Petitioner's first book, The Biggest Con, (see Exhibit 22), was published in 1976 to show that excess taxation, including inflation, and, the courts permitting of unauthorized executive branch regulations to be enforced as if they were statutes enacted by congress, contributed to ruin the greatest industrial economy the world had ever seen. That destruction is now completed. This Honorable Court unfortunately will experience the catastrophic consequences of that destruction in the not too distant future.

## CONCLUSION

Petitioner is 87 years old, legally blind, having completely lost sight in his right eye and has substantially diminished vision in his left eye, due to glaucoma – with no assurances that the sight in that eye will not be diminished further.  He also suffers from many of the infirmities and medical problems that are common to a man of his advanced age.  For these reasons he is being held in the medical unit of FCI Fort Worth where he is designated as "long term care", and, his medical file runs more than 1,000 pages.  Since the evidence is so overwhelming that Petitioner cannot be guilty of Count 17, he doubts that the Defendant-Respondent will even bother to contest this Petition where there is no conceivable basis that would allow him to claim that a deficiency existed in each of the years 1979-1985, for which the government was required to prove in order to convict Petitioner of Count 17, as provided in Jury Instruction 33.

Therefore Petitioner would appreciate this Honorable Court's ruling on this motion as soon as possible so that Petitioner can spend his remaining years playing with his grandchildren, especially while he can still see their faces.

Respectfully Submitted,

Irwin A. Schiff,  Reg. No. 08537-014

(Original signature appears on page 9 of the Petition.)

---

Endnotes

---

1.       The intention of endnotes 1 and 2 is to correct the Record, since the Record as to the facts stated is false and/or misleading. Unfortunately, lengthy notes are needed to make these corrections understandable. Overlooking the Ninth Circuit Court Of Appeals response to the first five issues, its Ruling on issue number six will show this Honorable Court the want of validity associated with all of the 9th Circuit's decisions in this case. In its rejection of this issue, the 9th Circuit begins as follows:

"Schiff argues that the District Court waited too long to rule on certain pre-trial motions. Virtually all of these motions were untimely, and with respect to the timely ones, the magistrate judge promptly recommended denial because they were frivolous."

If this statement claims to be accurate, why didn't the court mention that the delay in question was 17 months long, and that the motions at issue addressed jurisdiction and were timely filed two weeks before the arraignment, (Docket #'s 13, 14, 15, and 16). No other motions were at issue. One wonders what untimely motions the Court was referring to?

If the magistrate judge "promptly recommended denial" and "all of the motions at issue were frivolous" or "untimely filed" why then did it take the district court judge 17 months to issue its three page ruling (Docket # 199) accepting the magistrate's recommendations just days before the trial began?

In addition, the magistrate judge only used the "frivolous" accusation in connection with the jurisdictional motion involving "liability," saying as follows:

"Schiff's argument that the Court lacks jurisdiction because no statute makes him, or anyone else, liable for income taxes is so frivolous that it does not merit any discussion."

Obviously the rebuttal would have been far more credible if the magistrate had simply identified the liability statute at issue. Since he could not do so, he employed the "frivolous" response, a ploy used as subterfuge to get out of his dilemma.

The Supreme Court has ruled that jurisdictional issues "must be addressed before the court moves one step further." In addition, the moving party "must establish jurisdiction on the basis of a preponderance of the evidence." But here the court deliberately delayed ruling for 17 months, proceeding as if the challenge had not been made, thereby creating an intentional delay that prevented Petitioner from filing interim jurisdictional appeals. (Petitioner suspects that the delay was done with the approval of the 9th Circuit Court Of Appeals since the higher court would not want to directly address the four formidable jurisdictional motions). Since the magistrate offered no substantive rebuttal to Petitioner's claim that the absence of a "liability" statute denied the court subject matter jurisdiction, any legitimate appellate court would have regarded a 17 month delay on a jurisdictional ruling to be a blatant and arrogant disregard of the two key principles stated above and would have considered it plain and reversible error.

In line with this, at Petitioner's trial, no less than five prosecution witnesses testified that they could find no law that made anyone "liable" for income taxes. (See TPs 438, 1138, 2006, 2162, and 2235: Exhibit 2-b through 2-f). In addition, at least four defense witnesses, and Petitioner himself, offered the same testimony regarding the absence of such a statute. Since the question of "liability" is crucial to the legitimacy of the charges brought to trial, the prosecution was duty bound to produce the statute that no less than 10 witnesses testified they could not find. Since neither on cross-examination nor on redirect did the prosecutors produce any such statute, it is therefore obvious that no such statute exists.

Judge Dawson realized that the prosecutors did not attempt to refute the testimony of 10 witnesses; he decided to come to the government's rescue. In Jury Instruction #19 (Exhibit 1-a), he asserted, (at TP 5062, Exhibit 2-g), that "Code Sections 1, 61, 63, and 6012, *working together* make persons liable for income taxes." This instruction is totally without merit. No Supreme Court decision, Privacy Act and Disclosure Notice, or, Treasury Department document ever held that these four statutes "work together" to make persons "liable" for income taxes, and, neither did the judge or the magistrate judge in this case when they ruled on the "liability" issue as it related to jurisdiction before the trial.

When the Government wants to establish a tax liability, it does so explicitly with one statute. For example: Code Section 4401 (c), which applies to the Federal Wagering Tax, states as follows "Persons Liable for Tax: Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under the subchapter." If persons were similarly liable for the income tax there would be a statute that might read as follows: "Persons liable for tax: Each person who receives income shall be liable and shall pay the federal individual income tax as provided by the subchapter A of chapter 1 in Title 26." But no such statute exists.

2.   Petitioner filed a timely motion (and two supplemental motions totaling 80 pages in all) to vacate the 11 months of his alleged contempt of court charges that were added to his sentence, (accumulated as a result of Petitioner raising issues of law during the trial which represented his entire defense). In his appellate motions, Petitioner claimed that contempt orders numbers 2, 5, 6, 7, 8, 9, 10, 14, and 15, did not comply with Rule 42 (b) because they were not truthful but "fictional." (Petitioner could not analyze the remaining six contempt orders because he did not have the relevant transcript pages where he was incarcerated at the time of the appeal.)

On September 5, 2008 oral argument was held on Petitioner's motions and the government's five-page reply. Petitioner has included, (Exhibit 4), transcript pages 7, 8, 9, 10, and 15 as a sample of that hearing. On page 8 Petitioner states that he is willing "to go over each and every one of the contempt orders." The court responded, "You have already done that." However, the court overlooked the fact that all litigants have raised their issues in previous briefs to the court but at oral argument they are forced to defend their prior arguments.

On page 8 Petitioner points out to Judge Dawson something he already knew, "that his contempt orders were totally fictional not truthful" and therefore violated the 9th Circuit's Order. On page 9 Petitioner requests that they merely go over two of the contempt orders just as an example. However, again the Court says, "I don't need you to do that, I already read what you filed." On page 10, Petitioner states:

"So let me reply to the Government's position, which I have not. The Government's response did not contest or challenge any of the defendant's claims that each and every claim contained in the Court's Contempt Orders 2, 4, 5, 6, 7, 8, 10, 14 and 15 – the only contempt orders that Schiff could actually verify against the relevant transcript pages - - were false and fictitious, and as such, did not comply with the provisions of Rule 60 (d) (4) and the 9th Circuit's Order of 12-26-2007 that they do so."

On page 15 Petitioner offers to give the Court an example of how he misstated Contempt Order #10. But Judge Dawson would not allow Petitioner to do so since he obviously did not want those sitting in the courtroom to hear the extent to which he misrepresented the truth in just one contempt order. So at Petitioner's "oral argument", which was not really an oral argument, Judge Dawson denied Petitioner's motions (and two supplemental ones) to vacate the contempt orders. As a result, Petitioner notified the 9th Circuit of his intention to appeal that decision. Shortly thereafter Petitioner was notified that the Public Defender was authorized to file his appeal.

Petitioner had already experienced how the 9th Circuit totally ignored and misrepresented his *pro se* appeal, he agreed to let the Public Defender handle the case.

For example, in 2005, when the district court awarded a summary judgment, (CV-01-00895-PMP), to the government when it moved to reduce to judgment Petitioners assessments for the years 1979-1985, Petitioner filed a 40-page appeal citing 11 grounds why the summary judgment was not justified. One of those grounds was that the district court had awarded the government summary judgment even in connection with unproven and contested civil fraud penalties. The summary judgment should have been reversed just on this ground alone. In its essentially one-page unpublished response, (No. 05-15233; D.C. No. CV-01-00895-PMP (3/29/2006)), the 9th Circuit still managed to cram in six misstatements of both law and fact and also sanctioned Petitioner $6,000.00 for allegedly filing a frivolous appeal. Therefore Petitioner filed a 20-page Motion for Reconsideration correcting those errors and also reminding the court that his appeal was justified based solely on the civil fraud issue. However the 9th Circuit denied Petitioner's motion without comment and even sustained the $6,000.00 sanction.

Since Petitioner believed that the 9th Circuit would not treat an appeal from the Public Defender with as much contempt, he agreed to allow the Public Defender to handle the Petition appealing the contempt orders.

Subsequently the Petitioner sent the Public Defender the three motions to dismiss the contempt orders plus his completed appeal brief, which he had not as yet submitted. Shortly thereafter Petitioner received a phone call from the Public Defender telling him that based on a recent Supreme Court decision, he also wanted to raise the issue that Petitioner should not have been allowed to represent himself at trial (an issue that Petitioner did not raise in the lower Court).

However during that telephone conversation Petitioner told the Public Defender that he was really only interested in raising the validity of the contempt orders, but if he thought that issue would be helpful, then he could raise it. The Public Defender assured Petitioner that he would also challenge the contempt orders. In Exhibit 5, Petitioner has included a copy of a letter that he sent to the Public Defender reminding him of this assurance. The letter was followed up by yet another phone call in which this assurance was again confirmed.

However in total violation of these assurances, the Public Defender did not raise even one of the fraudulent contempt orders. The Supreme Court decision the Public Defender relied upon referred no relationship with Petitioner's ability to represent himself. The individual in that decision was a schizophrenic who had spent considerable time in a mental institution and had even been held by some judges as being unfit to stand trial. In opposing the motion, the government argued that Petitioner did a

good job representing himself and that the Magistrate had held that Petitioner was fully competent to represent himself at the November 5, 2008 hearing. The appeals court had no trouble dismissing the Public Defender's motion. The petition to the Supreme Court was a ruse to make it appear that the Public Defender was really serious about the issue he raised on appeal.

Obviously the Ninth Circuit colluded with the Public Defender to substitute an issue that Petitioner did not raise rather than the issue he did raise since the 9th Circuit obviously did not want to consider an appeal which would have compelled it to rule that one of its lower court judges could not be relied on to tell the truth, even when ordered to do so by the 9th Circuit.

So the 9th Circuit sustained the 11-month contempt sentence even though Petitioner had been unlawfully denied his right to have Judge Dawson's contempt orders reviewed by an appeals court. Had the Public Defender told Petitioner that he would not raise the contempt orders in his appeal, Petitioner would have revoked the Public Defender's authorization to file the motion. Petitioner believed that even if the Public Defender filed a sampling of the 9 contempt orders he had challenged, he would have had to prevail in the court of appeals. Therefore, Petitioner would have established that Judge Dawson was not "impartial" and Petitioner could have reversed his conviction based on that issue alone. In addition, in considering the Public Defender's appeal, the 9th Circuit violated its own rules that it would not consider an appeal unless the issues had been raised in the lower courts. It listed 3 exceptions to this rule. The appeal fell into none of the exceptions, thus it should have been rejected pursuant to the 9th Circuits own published rules.

3.     Nothing happens to those taxpayers who simply toss such notices into the nearest trashcan. (See U.S. vs. Schulz, 395 F. 3d – 2nd Circuit) For example: "An individual owed me a considerable sum, so we entered into a contract wherein he agreed to discharge his indebtedness by sending royalties twice a year for a number of years to Petitioner's ex-wife. Subsequently an I.R.S. agent paid him a visit and personally served him with the I.R.S.' traditional "notice of levy", in an attempt to take those royalties. He did not "honor" the "notice" but continued sending the royalties to Petitioner's ex-wife, and suffered no adverse consequences by doing so. However, Judge Dawson, refused to allow Petitioner to call him as a defense witness at Petitioner's criminal trial." Most commonly, people honor them for two reasons. The first being the totally false but intimidating language that appears on the reverse side of the notice which claims to reproduce Code Section 6331 as its authority. But it omits the only portion of that section (6331 (a)) that would inform the public that the "notice" does not apply to them nor to the property sought to be seized by the notice. The balance of Section 6331 applies to an actual "levy," and not a mere "notice of levy." However, the public was not made aware of the distinction. The second reason people honor these fraudulent and benign "notice of levy" is because they fear the alleged punitive powers of the I.R.S.. There is no question that I.R.S. agents who mail out such notices are engaged in mail fraud.

Additionally courts have held that to be charged with tax evasion, a person would have to attempt to evade a "substantial" amount of taxes. Petitioner does not know what a "substantial" amount of taxes actually means, but he suspects it would have to be in excess of $100,000.

As shown in Ms. Davaz's declaration, Petitioner was charged with tax evasion for the years 1981, 1984, and 1985 for allegedly attempting to evade less than $10,000 for each of those years. For 1984 he was actually charged with allegedly seeking to evade $5,567.00. Petitioner believes that this is undoubtedly the lowest amount the Government has ever charged a person for a §7201 violation.

4.     Judge Dorsey claimed that Petitioner's zero returns for 1980-1985 were "invalid" as shown in TP's 1642, 1643, and 1644, 1676 and 1677, (see Exhibit 2m – 2q) and, (Exhibit 9), I.R.S. Forms 4340 showing that zero assessments were made from Petitioner's zero returns approximately one year before Judge Dorsey issued his ruling. So the prosecution's main witness – who never took the witness stand – against Petitioner <u>was</u> Connecticut District Court Judge Peter C. Dorsey.

1
2
Jury Instruction No. 33

3       Count Seventeen of the Indictment charges Irwin Schiff with willfully attempting to

4  evade and defeat the payment of approximately $1,369,000 in income taxes, penalties, and interest

5  due and owing for 1979-1985.  In order for you to find Mr. Schiff guilty of that charge, you must find

6  that a tax deficiency existed for those years, that Mr. Schiff willfully attempted to evade the taxes

7  owed for those years, and that Mr. Schiff committed at least one affirmative act to evade the taxes

8  owed, with all of you agreeing on at least one particular affirmative act.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

EXHIBIT 1

Jury Instruction No. 34

As to Count 17, a tax due and owing may be ascertained in three ways: by the taxpayer reporting the amount of tax due and owing; by the IRS examining the taxpayer and assessing the tax; or if the taxpayer fails to file a return and the government can prove a tax deficiency the deficiency arises on the date the return was due.

In cases where the IRS examined the taxpayer and assessed the tax, a certificate of assessments and payments is "adequate evidence" of a tax liability.

36

EXHIBIT 1-a

5070

1    beyond a reasonable doubt that the offense was committed on a

2    date reasonably near the date alleged in the Indictment, it is

3    not necessary for the government to prove that the offense was

4    committed precisely on the date charged."

5              "Jury Instruction No. 32

6              "Title 26, United State Code, Section 701 provides in

7    part, that:

8              "'Any person who willfully attempts in any manner to

9              evade or defeat any tax imposed by this title or the

10             payment thereof shall . . .' be guilty of an offense

11             against the United States."

12             "... Instruction No. 33

13             "Count Seventeen of the Indictment charges Irwin Schiff

14   with willfully attempting to evade and defeat the payment of

15   approximately $1,369,000 in income taxes, penalties, and

16   interest due and owing for 199-" -- "1979-1985. In order for

17   you to find Mr. Schiff guilty of that charge, you must find that

18   a tax deficiency existed for those years, that ... Schiff

19   willfully" -- "Mr. Schiff willfully attempted to evade the taxes

20   owed for those years, and that Mr. Schiff committed at least one

21   affirmative act to evade the taxes owed."

22             "Jury Instruction No. 34

23             "As to Count 17, a tax due and owing may be ascertained

24   in three ways: by the taxpayer reporting the amount of tax due

25   and owing; by the [Commissioner] examining the taxpayer and

EXHIBIT 2

1   assessing the tax; or if the taxpayer fails to file a return and

2   the government can prove a tax deficiency the deficiency arises

3   on the date the return was due.

4        "In cases where the IRS examined the taxpayer and

5   assessed the tax, a certificate of assessments and payments is

6   'adequate evidence' of a tax liability."

7        "Jury Instruction No. 35

8        "As to Count 17, a failure to act is not an attempt to

9   evade one's taxes.  But any affirmative act, 'the likely effect

10  of which would be to mislead or to conceal' one's tax liability,

11  is an attempt to evade taxes.

12       "An affirmative 'willful attempt' to evade or defeat

13  income tax may be inferred from conduct such as keeping a double

14  set of books, making false entries or alterations, or false

15  invoices or documents, destruction of books or records,

16  concealment of assets or covering up sources of income, handling

17  of one's affairs to avoid making the records usual in

18  transactions of the kind, and any other conduct the likely

19  effect of which would be to mislead or to conceal.

20       "Other examples of affirmative acts of evasion ... of

21  tax include placing assets in the name of others, causing debts

22  to be paid through and in the name of others, using bank

23  accounts in the names of others, transacting business in cash or

24  cashier's checks, and paying other creditors instead of the

25  government."

EXHIBIT 2-a

Page 438

1   Q.   Can I -- so you checked those Code sections and found there

2   was a provision for paying taxes in all those Code sections?

3   A.   That's correct.

4   Q.   So you couldn't find any statute that made you liable for

5   tax or required you to pay the tax; is that correct?

6   A.   That's correct.

7   Q.   So continue what you said.

8   A.   The same paragraph?

9   Q.   "I['m] filing anyway."

10   A.   Oh.

11        "I['m] filing anyway, because I know the government has

12   prosecuted others for failing to file income tax returns by

13   (erroneously) invoking Code section 7201 and 7203."

14   Q.   Stop right there.

15        So you were aware that people get prosecuted for not

16   filing; is that correct?

17   A.   Yes.

18   Q.   So in order to avoid pros- -- you knew I was prosecuted for

19   failing to file?

20   A.   Yes.

21   Q.   Twice at least.

22        So, in order for you not to be prosecuted, you were

23   filing.

24   A.   That's correct.

25   Q.   Okay.   Continue.

EXHIBIT 2-b

1    A.  That's correct.

2    Q.  Now, what is that --

3         THE COURT:  What's it being offered for?

4    BY MR. SCHIFF:

5    Q.  What is that index called that you're lookin' at?

6    A.  The particular one is, uh, "Liability for Tax."

7    Q.  "Liability for Tax."

8         Approximately how many tax -- taxes are listed there?

9    A.  Over 50.

10   Q.  Do you want to read some of them?

11        THE COURT:  No, we're not gonna do that.  You need to

12   get your question more specific.

13   BY MR. SCHIFF:

14   Q.  The question is -- is -- is -- in other words, there's

15   reference to tobacco taxes, alcohol -- is there any reference to

16   income tax?

17   A.  (Reviewing document.)  Not that I could tell there is no

18   reference to income tax.

19   Q.  Well, do you think that could have influenced your belief

20   that there was no law making you liable because when you went to

21   the Code under "Liability for Tax" you could not see any

22   reference to income tax?

23   A.  That's correct.

24   Q.  So that could have influenced you?

25   A.  Yes.

EXHIBIT 2-C

1    Court decisions and other type of authority, that they used in

2    support of their position that you had this liability.   True?

3    A.  Yes.

4    Q.  At any time during the course of this hearing, did you feel

5    that you received from the agent of the IRS authority which

6    supported the IRS's position that you had this liability?

7    A.  No.

8    Q.  Okay.  So, at the end in the conclusion of that particular

9    hearing, based on the dialogue that you had with that particular

10   agent, you did not believe that you received the information

11   that put you on notice that you legally had to pay that

12   liability; correct?

13   A.  Correct.

14   Q.  And so, therefore, not having that material in front of you

15   after requesting it you went one further and requested a hearing

16   in front of the Tax Court; correct?

17   A.  Yes.

18   Q.  And, at any particular time prior to, um, being contacted by

19   one of the agents in this criminal investigation, did any agent

20   of the IRS as it related specifically to your case ever give you

21   that authority to support their position that you legally -- you

22   had a legal -- you had a li- -- you had a legal liability to pay

23   that income tax or that tax?

24   A.  Specifically to the liability, no.

25   Q.  Okay.  Now -- and then you eventually got contacted by

EXHIBIT 2-d

1    agents that were investigating this particular case; correct?

2    A.  Yes.

3    Q.  Uh, at any particular time did anyone from that

4    investigation advise you that other police officers in different

5    jurisdictions, I believe, i.e., Miami or Florida, have actually

6    been prosecuted and convicted for not, uh, filing proper 1040

7    returns?  Do you recall that?

8    A.  I don't recall that specific information offhand.  It may

9    have occurred.

10   Q.  So you don't recall any agent basically tellin' you that if

11   you don't live up to your responsibility in terms of paying your

12   taxes there's a possibility you could be prosecuted criminally?

13   A.  Oh, yeah, they said that.

14   Q.  Okay.

15   A.  But they didn't specifically -- I don't specifically recall

16   police officers being -- uh, they did mention that other persons

17   were --

18   Q.  Okay.

19   A.  -- ultimately prosecuted, yes.

20   Q.  So other persons that were claiming the same type of legal

21   positions that you were claiming have in fact been prosecuted

22   criminally?

23   A.  I don't know that.

24   Q.  Did that --

25   A.  They only represented that, yes.

1   Q.  They represented that to you.

2           And, you know, I mean, as a -- as a former New York

3   police officer, um, and a bailiff here in Clark County, you

4   have -- you have a pension I would assume; correct?

5   A.  Yes, I do.

6   Q.  And you -- you to this day are still employed by the County.

7   True?

8   A.  Yes.

9   Q.  And would it be safe to say that -- Mr. Diamond, that, um,

10  you in no way want to go through a criminal investigation and/or

11  prosecution for any of these activities?

12  A.  That would be correct to say that, yes.

13          MR. CRISTALLI:  I have no further questions, your

14  Honor.

15          Thank you, Mr. Diamond.

16          THE COURT:  Mr. Bowers.

17          MR. BOWERS:  Just two or three real quickly.

18

19                      CROSS-EXAMINATION

20  BY MR. BOWERS:

21  Q.  Good morning, Mr. Diamond.  How are ya?

22  A.  Good morning.

23  Q.  I'm Chad Bowers.  I'm an attorney for, uh, Larry Cohen.  You

24  may or may not recognize me.

25  A.  Yeah.  We know each other, yes.

1   and, two, he's testifying as well.

2           THE COURT:  Sustained.  Strike.

3               (Discussion between Mr. Leventhal and

4               Mr. Schiff.)

5   BY MR. SCHIFF:

6   Q.  Okay.  So, based upon that, you claimed exempt; is that

7   right?

8   A.  Correct.

9   Q.  Not because I told you to claim exempt?

10  A.  No.

11  Q.  But I brought what I thought was the statute, which you

12  could read, and to make up your own mind; is that correct?

13  A.  Correct.

14  Q.  And, because you did that, you stopped the withholding of

15  wages [sic] --

16  A.  Correct.

17  Q.  -- from your pay?

18          And you thought that was perfectly legal?

19  A.  Correct.

20  Q.  Okay.  Incidentally, you said you read --

21          THE COURT:  No.

22  BY MR. SCHIFF:

23  Q.  -- the whole book.

24          THE COURT:  No.

25

EXHIBIT 2-e

1   Q.  Okay.  The next statement you said, "In addition, we had no

2   statutory income tax 'liability' for this year."

3           When you signed this document and sent it in, did you

4   believe that you had no liability for income taxes?

5   A.  That's correct.

6   Q.  You did.

7           How did you make that determination?

8   A.  By examining the, uh, U.S. Tax Code, which I have right

9   here --

10  Q.  Okay.

11  A.  -- with me.

12  Q.  So, when you examined the United States Tax Code on your

13  own, you could not find any reference in that Code that provided

14  for a liability for income tax; is that correct?

15  A.  That's correct.

16  Q.  You just didn't take my word for it; you checked it out.

17  A.  That's correct.

18  Q.  Okay.

19          MR. NEIMAN:  Your Honor, I'm gonna object to the line

20  of questioning.  Mr. Dentice's beliefs and his tax returns,

21  that's not the relevance of his testimony here today.  It's

22  beyond the scope, uh, in that regard.

23          MR. CRISTALLI:  Your Honor --

24          MR. SCHIFF:  Your Honor --

25          MR. NEIMAN:  We're relitigating --

EXHIBIT 2-F

1    screen?

2            MR. IGNALL:  No.  Hopefully the one that's up on the

3    screen will be the same one that -- I -- that's not it.  I'm

4    sorry.

5            (Pause in the proceedings.)

6            MR. IGNALL:  It should be one page after this.  That's

7    a different year.  I think I have a little bit of a -- if we

8    could turn -- what's the --

9    BY MR. IGNALL:

10   Q.  If I could turn your attention -- flip a little bit farther,

11   Ms. Morgan.  We can look in the book, we can hopefully end up on

12   the same page.  I believe it's probably another half dozen

13   pages.  If we go to the one for the tax period December 1984.

14           THE COURT:  Is it the same Certificate of Assessment?

15           MR. IGNALL:  Yeah.  Looks like...

16           THE WITNESS:  1984?

17   BY MR. IGNALL:

18   Q.  Yes.  On the bottom -- the number on the bottom is DS008913.

19   A.  Okay.  I have that.

20   Q.  Are you on that page?  All right.

21           Could you explain briefly what each line item on that

22   is?

23   A.  Okay.  Starting at the top, it shows the name of the

24   taxpayer, which is Irwin Schiff.  It shows the Social Security

25   number.

EXHIBIT 2-g.

1    Q.  Okay.

2    A.  And then below that it shows it's a U.S. individual income

3    tax for the individual; the tax period is December 1984.

4            The next columns are the dates.  Then it has an

5    explanation of the transaction --

6    Q.  Okay.

7    A.  -- the assessment, whether it be an assessment debit or a

8    reversal, then it has a payment common -- column -- excuse me --

9    and then the assessment date.

10   Q.  All right.  And then let's go to the first item.

11   A.  The very first item shows the date of August 8, 1991.  There

12   was a Prompt Assessment made.

13   Q.  What's a Prompt Assessment?

14   A.  That's when a individual actually brings in a tax return to

15   the -- usually a field office and they find that they need to

16   process that return as soon as possible.  And so an

17   administrative decision is made to get the return on the

18   assessment as quick as possible.

19   Q.  Okay.  Could you -- uh, and is there an amount of the

20   assessment listed on this form?

21   A.  The amount assessed is $5,567.

22           MR. SCHIFF:  What doc-...

23           (Discussion between Mr. Leventhal and

24           Mr. Schiff.)

25

EXHIBIT 2-h

1   BY MR. IGNALL:

2   Q.   And just -- just briefly go to the other items that are

3   listed on this page here.

4   A.   The next date, September 6, '91, there was a federal tax

5   lien in place.

6            October 22nd, '91, the assessment statute expiration

7   date was extended.   So that means it gives permission for an

8   additional time to actually get the -- the tax assessed and

9   collected.

10           August 21st, 1992, a lien again.

11           Then there was some penalties assessed --

12  Q.   All right.

13  A.   -- the estimated tax penalty of $350; an additional tax

14  assessment by exam was nothing; additional tax assessed by the

15  default letter, which is the 90-day letter, was nothing; and a

16  renumbered tax return, means the audit was closed --

17  Q.   Okay.

18  A.   -- was April 18th, 1994; and then the quick assessment was

19  nothing.

20  Q.   All right.   If you could look at -- at this document for

21  year 1984, do you have some way to tell how much the balance is

22  for this taxpayer for that tax year?

23  A.   Yes.   The balance on the Form 4340 is showed on the last

24  page, which the number is DS008916 --

25  Q.   Let me --

EXHIBIT 2-i

1    BY MR. IGNALL:

2    Q.  And just -- just briefly go to the other items that are

3    listed on this page here.

4    A.  The next date, September 6, '91, there was a federal tax

5    lien in place.

6         October 22nd, '91, the assessment statute expiration

7    date was extended.  So that means it gives permission for an

8    additional time to actually get the -- the tax assessed and

9    collected.

10        August 21st, 1992, a lien again.

11        Then there was some penalties assessed --

12   Q.  All right.

13   A.  -- the estimated tax penalty of $350; an additional tax

14   assessment by exam was nothing; additional tax assessed by the

15   default letter, which is the 90-day letter, was nothing; and a

16   renumbered tax return, means the audit was closed --

17   Q.  Okay.

18   A.  -- was April 18th, 1994; and then the quick assessment was

19   nothing.

20   Q.  All right.  If you could look at -- at this document for

21   year 1984, do you have some way to tell how much the balance is

22   for this taxpayer for that tax year?

23   A.  Yes.  The balance on the Form 4340 is showed on the last

24   page, which the number is DS008916 --

25   Q.  Let me --

EXHIBIT 2-j

Page 5120

1  that can defeat this good-faith misunderstanding, that includes

2  an "awareness of the relevant provisions of the Internal Revenue

3  Code regulations or [sic], of court decisions rejecting or

4  accepting their interpretation of the law, [or] of authoritative

5  rulings of the Internal Revenue Service."

6         You've seen evidence that time and time again

7  defendants were put on notice that what they were doing and what

8  they were selling was wrong.  They were told by the IRS, they

9  were told by the courts, and they were told by customers who

10  learned the hard way that what these customers were doing was

11  illegal.

12         Somebody who misunderstands the law might be acting be

13  good faith the first time he or she does something.  But, once

14  that person's told otherwise, he or she is not acting in good

15  faith the next time and certainly isn't acting in good faith the

16  hundredth time you do the same thing over and over.  This is

17  notice that negates good faith.

18         The idea that taxes are optional -- well, how anyone

19  might like to believe that or -- or think that could be true --

20  is so outlandish and preposterous that it would very hard to

21  hold that belief in good faith.  But some people may.

22         For example, Virginia Olen, the cab driver you heard

23  testify, may have been acting in good faith when she filed the

24  zero return that Lawrence Cohen prepared for her.  But, after

25  she sent that into the IRS, she got the frivolous return letter,

EXHIBIT 2-K

Page 5121

1    just like the customers before her and after her.  And, after

2    she got this frivolous return letter, she went ahead and called

3    the IRS.  She asked some questions, she got some answers, she

4    learned that her position was incorrect, she filed a correct

5    return, and she paid the tax.  That shows she probably was

6    acting in good faith.

7         But imagine instead after she got this notice from the

8    IRS she went ahead and filed the zero return the next year.

9    Well, in that case she wouldn't be acting in good faith because

10   she's on notice that her position that wages aren't income has

11   already been rejected.

12        Irwin Schiff, Cynthia Neun, and Lawrence Cohen weren't

13   told just once, but they were told over and over and over again

14   that their contention that taxes are somehow optional is

15   flat-out wrong.  This is more and more notice.

16        These defendants are stubborn.  So no letter, no court

17   decision, no description of the law is gonna shake them.  They

18   refuse to listen.  But someone who is acting in good faith

19   listens and learns from information and decides to take the high

20   road, the way Virginia Olen did, instead of repeatingly --

21   repeatedly insisting on breaking the law.

22        You've heard evidence that Mr. Schiff has had more than

23   30 years of notice.  He's had 30 years of running the IRS in

24   circles, something that Judge Dorsey said he was doing back in

25   1991, during his probation revocation hearing process.  He's

2K

P9.2

Page 286

1   King.  And every place I went I said, "I don't pay income

2   taxes."  If a person believes he's breaking the law, does he

3   go -- does he say, yeah, I robbed a bank yesterday?  The

4   government knew what I was doing; I didn't make a secret of it.

5          The point is:  Essential to this trial is belief.  See,

6   an income tax trial is a little different than a normal criminal

7   trial.  Normally a criminal trial is:  Did he rob the bank?  Did

8   he do what he's charged with doing?  Did he do it?  Income tax

9   is a little different.

10         If a man walked off the boat from Thailand, the minute

11  he landed in the United States he knew he couldn't rob, he

12  couldn't steal, he couldn't rape.  These are universal crimes.

13  But suppose the next day he started to sell fortune cookies off

14  a fish cart.  Would he know you had to pay income taxes on it?

15  No.  So, in order for him to be guilty of a tax crime, the

16  Government has to prove not only didn't he pay taxes but he knew

17  he had an obligation to pay taxes.  And it's what he knew, not

18  what everybody else knew.  It's what he knew.  It's what I know.

19  And I know I don't have to pay income taxes.  I've told that to

20  the government for -- I've asked judges to show me the law, as

21  the evidence will show.  They won't tell me the law that says

22  you're liable to pay income taxes, the government won't tell me

23  the law that requires me to pay income taxes.

24         I sell the Internal Revenue Code.  And, if the

25  Government will even show me any statute in this Code that says

EXHIBIT 2-1

1    I have to pay income taxes or I gotta keep books and records for

2    income tax purposes, I'll plead guilty right now and I'll save

3    the court the expense of the trial.

4           Now, for about 30 years -- I'll be taking the witness

5    stand.  What the Government has to prove, what the Government is

6    saying to you people is that businessmen, doctors, hundreds of

7    people stopped paying income tax because I told 'em.  Does that

8    make sense to anybody?  If I told 'em to rob a bank, if I told

9    them they can distill whiskey, would they suddenly do that?

10          Suppose I had a sign in front of my building that says

11   I sell cigarettes cheap because I don't pay tobacco taxes?  How

12   long do you think they'd let me stay in business?  Well, I have

13   a sign in front of my building:  Hey.  Why pay income taxes?  No

14   law says you have to.  Come on in and we'll show you why you

15   don't have to pay.  And you don't have to pay because it's

16   voluntary in my view.

17          And I've had people -- and I had a radio show.  We

18   don't screen our calls.  Anybody could call my show and

19   challenge what I said.  I think I'll -- I'll get the engineer

20   from KLAV.  And, in four or five years, we didn't have one call,

21   people calling saying I followed your advice and I had trouble.

22          If you go to my Web site, we had letters from people

23   who said I'm not paying income tax because I followed your

24   advice.  And all those refund checks that people got, I never

25   told 'em that they were gonna get refund checks.  I told 'em

Page 483

1           MR. SCHIFF:  Well, if they have to interpret, it's void

2    for vagueness.

3           THE COURT:  Court decisions don't make any difference.

4           MR. SCHIFF:  Then how about all the five-to-four

5    decisions?  What's the law in those cases?  How about dissension

6    among the circuits?  What is the law in those cases?

7           THE COURT:  It's uniform.  The tax is valid.

8           MR. SCHIFF:  I never said it wasn't.  You never heard

9    me say the taxes are valid [sic]; it's voluntary.  That's what I

10   believe.  I never said --

11          THE COURT:  All right.

12          MR. SCHIFF:  -- the laws aren't valid.  I sell the law.

13          THE COURT:  We'll do it out there.

14              (Sidebar conference concluded and the

15              following is held in open court:)

16          THE COURT:  The witness will be excused as well while

17   we discuss this.  You'll stand outside.

18              (Witness leaves the courtroom.)

19          THE COURT:  Mr. Cristalli.

20          MR. CRISTALLI:  Thank you, your Honor.  I appreciate

21   that.

22              Um, your Honor, during the course of Ms. Mitchell's

23   testimony, there was a question asked of her in terms of her

24   beliefs and what her beliefs are currently.  There was an

25   objection by the Government, and the Court sustained it.

1          MR. SCHIFF:  Okay.

2          THE COURT:  -- his recollection.

3    BY MR. SCHIFF:

4    Q.  Matt, you said that when you came to -- did I understand

5    your testimony when you said you came to Freedom Books to get an

6    attachment was -- was your testimony that we charged you for the

7    attachments?

8    A.  Yes.

9    Q.  Well, can you -- we charged you for the attachment?

10   A.  Yes.

11   Q.  Is that your recollection?

12   A.  That's my testimony.  Yes.

13          THE COURT:  Asked and answered.  Move on.

14   BY MR. SCHIFF:

15   Q.  But... Okay.

16          Um, now, when you read that book, Matt, did that book

17   persuade you that the payment of income tax was voluntary?

18   A.  Yes.

19   Q.  Did the book persuade you that the IRS seized property

20   illegally?

21   A.  Yes.

22   Q.  Did that book along with the Internal Revenue Code persuade

23   you that there was law that made you liable?

24   A.  In those two books, yes.

25   Q.  And that book in connection with the Internal Revenue Code

1 BY MR. SCHIFF:

2 Q.  Do you recall me passing out documents at the seminar?

3 A.  Uh, sir, again, I have to say I don't -- I do not recall

4 that either.

5 Q.  Okay.  Do you recall at the seminar -- do you recall me

6 discussing the history of the income tax?

7 A.  Again, it has been so long I have no memories of that

8 seminar, sir.

9 Q.  Do you recall me discussing the meaning of income for tax

10 purposes?

11 A.  Yes, sir.

12 Q.  Pardon me?

13 A.  Yes, sir.

14 Q.  You do recall that?

15 A.  I do recall you discussing about getting information about

16 the tax, uh, filing.

17 Q.  Do you recall me passing out and going over the exhibits in

18 The Federal Mafia where the Government refers to the voluntary

19 nature of the income tax?  Do you recall that, me discussing

20 the -- the potential voluntary nature of the income tax?

21 A.  Yes, I do recall that, uh, filing for tax return is a

22 volunteer program, should be volunteer.

23 Q.  Did you remember me asking the people in attendance how many

24 people did not -- asking for a show of hands as to how many

25 people did not believe that payment of income tax was voluntary?

1    can do so --

2    BY MR. SCHIFF:

3    Q.  Would -- would --

4         THE COURT:  -- without --

5         MR. SCHIFF:  -- I mean, he just said he learned at the

6    seminar payment is voluntary.

7    BY MR. SCHIFF:

8    Q.  Would that have been because we went over a number of

9    government documents which stated the payment is voluntary?

10   A.  That's correct.

11   Q.  Would that have been the reason?

12   A.  That is correct, sir.

13   Q.  So it wasn't because I said the payment is voluntary.  We

14   produced documents in which the government said payment is

15   voluntary.

16   A.  That is correct, sir.

17   Q.  Okay.  Now, as a matter of fact, in the return that you

18   filed, the first statement on that return is -- can you look at

19   that first statement?  Just -- just read the first paragraph.

20        THE COURT:  Which are you referring to?

21        THE WITNESS:  You want my to read this one?

22   BY MR. SCHIFF:

23   Q.  Yeah.  Just read it.

24   A.  "Establishes an income tax 'liability' as, for" --

25   Q.  It says, "We" -- just read the first -- first four lines.

1    BY MR. SCHIFF:

2    Q.  -- the return that I filed for the year 2002.

3              (Discussion between Mr. Leventhal and

4              Mr. Schiff.)

5    BY MR. SCHIFF:

6    Q.  Is that the -- is that my 2002 tax return that I filed for

7    the year 2002?

8    A.  Okay.  I can take that -- this document and I can marry it

9    up with the actual 2002 and match the document locator numbers

10   and tell you yes or no.  Would you like me to do that?

11   Q.  Well -- well, all I want -- you know, I wanna do it the

12   simplest way possible.

13   A.  On Exhibit 45 shows a 2002 zero return and it does not have

14   a document locator number.

15   Q.  Okay.  It doesn't have a document locator.

16   A.  No, it --

17   Q.  In any case --

18   A.  -- does not.

19   Q.  -- is it a fact that I reported that I had zero income in

20   that year and I had zero taxes owed?  Is that what I said --

21   A.  On --

22   Q.  -- on that document?

23   A.  On the 4340 or on the --

24   Q.  No.  On --

25   A.  -- return?

EXHIBIT 2m

1   Q.  -- on my tax return.

2   A.  On your tax return on the 2002 year --

3   Q.  Yes.

4   A.  -- it shows all zeroes.

5   Q.  That I swore under penalty of perjury that I had zero income

6   and zero liability?

7   A.  Correct.

8   Q.  Okay.  Now, the 4340, which is Government Document 22 --

9   read what the first line says on -- on the Government's

10  document.

11  A.  Certificate of Assessment, Payments, and Other Specified

12  Matters.

13  Q.  No, no.  Well, not -- the -- the first -- well, that's --

14  the first entry, return...  That -- that would be the entry --

15  what entry was made on June 17th, 2003?

16  A.  It says, "return filed and tax assessed."

17  Q.  And what was assessed?

18  A.  The assessment was zero.

19  Q.  Okay.  So the Internal Revenue Service obviously processed

20  that return and entered that I filed a return and they made some

21  kind of an assessment; is that right?

22  A.  This is the return and the self-assessment that you made --

23  Q.  All right.

24  A.  -- on your tax return.

25  Q.  All right.  And they used my return to make those entries?

EXHIBIT 2-n

1    A.   Yes.

2    Q.   Okay.  So -- so I assume it was processed by the IRS?

3    A.   Right.  It has a document locator --

4    Q.   Okay.

5    A.   -- number.

6    Q.   Okay, okay.  Government's Exhibit 41 -- I'm sorry.  Strike

7    that.

8              THE COURT:  He said never mind.

9              THE WITNESS:  Never mind?

10   BY MR. SCHIFF:

11   Q.   Okay.  Government's Exhibit 40 --

12   A.   40?

13   Q.   Yes.

14             -- that's the Government's Form 4340; is that correct?

15   A.   No.

16   Q.   Humm?

17   A.   Exhibit 40?

18   Q.   Exhibit 40 is a Certificate of Official Record.

19   A.   Right.

20   Q.   And it says for the tax year ending 1997.

21   A.   That is a certified copy of the tax return.

22   Q.   Well, there's a tax return here also, but -- I saw the

23   return.  Oh, I'm sorry.  Oh, I'm sorry.  Exhibit 40 is the tax

24   return I filed for the year 1997.

25   A.   Correct.

EXHIBIT 2-O

1    BY MR. SCHIFF:

2    Q.  -- and the Government claims that it received a return and

3    its assessed a tax on 12-23-90- -- 1991.  Is that correct?

4    A.  That's correct.

5    Q.  Okay.

6           THE COURT:  Well --

7           MR. SCHIFF:  Now, let's --

8           THE COURT:  -- the government assessed a tax or the

9    government --

10          THE WITNESS:  Processed.

11          THE COURT:  -- processed a self-assessed? .

12          MR. SCHIFF:  Pardon me?  I didn't hear that.  The

13   Government -- I'm just --

14          THE COURT:  Wait a minute.

15          As I understand your prior testimony, when the 4030 is

16   generated, it records the self-assessed tax.

17          THE WITNESS:  That is correct.  What is -- what is

18   stated on the tax return.

19   BY MR. SCHIFF:

20   Q.  But this is merely a copy of other government records; is

21   that correct?  This reflects that -- that assessment -- if I

22   understand it, doesn't that reflect an assessment that was made

23   officially and this merely reflects that it was made?

24          THE COURT:  This is your self-assessment.

25          MR. SCHIFF:  Yeah, but that --

EXHIBIT 2-p

1    THE COURT:  This records your self-assessment, not the

2    government's assessment.

3    MR. SCHIFF:  Well, but the government had to --

4    BY MR. SCHIFF:

5    Q.  Is that recorded on a government document someplace?  On a

6    40- -- Form 23C?  Do you know what a Form 23C is?

7    A.  I do.

8    Q.  Okay.  What is a Form 23C?

9    A.  A Form 23C actually is the racks below that.  In that column

10   you'll see an RAC 006.

11   Q.  Oh, it refers to the 23C.

12   A.  Right.  And in --

13   Q.  It says, "Assessment Date (23C)."

14   A.  Right.

15   MR. BOWERS:  Judge, I'm sorry --

16   THE WITNESS:  And that's the official date that this

17   zero self-assessment was on the account.

18   BY MR. SCHIFF:

19   Q.  Okay.  So --

20   A.  It's --

21   Q.  -- the government officially --

22   A.  -- a cumulative report from the RAC 006.

23   Q.  Yeah.  Well, the government officially recorded that on

24   its --

25   A.  At that date.

EXHIBIT 2-9

1    BY MR. NEIMAN:

2    Q.  All right, Mr. Schiff.  You had a hearing before Judge

3    Dorsey?

4    A.  You can call it that if you want to.

5    Q.  You may disagree with what I call it, but --

6    A.  Yeah, if you wanna call it a hearing.

7    Q.  Well, looking at page 3 of the order --

8    A.  Page 3?

9    Q.  Page 3.

10   A.  Yes.

11   Q.  -- does it not say -- I'm sorry -- page 2 --

12   A.  Page 2.

13   Q.  -- "probable cause for a violation was found, based on

14   defendant's filing, for 1980" --

15   A.  Hold it.  Where are you reading from?

16   Q.  Uh, page 2.

17   A.  Page 2.

18   Q.  It's blown up on the screen if you look right to your left.

19   A.  All right.  Page 2.  Go ahead.

20   Q.  "Probable cause for a violation was found, based on

21   defendant's filing, for 1980 through 1988, 'zero' returns."

22        Does it not say that?

23   A.  "Probable cause ... was found based on" -- "based on ...

24   filing, ... 'zero' returns ... with zeroes for all the pertinent

25   categories."

EXHIBIT 2-r

1    Q.  Mr. Schiff, that's what the document --

2    A.  That's what he said.

3    Q.  -- says?

4    A.  That's what he said.

5    Q.  That's what the document says?

6    A.  That's what the document said.  But -- but the charge was I

7    failed to file.  It was not up to Judge Dorsey to determine

8    whether a return was valid.

9    Q.  Mr. Schiff --

10   A.  Well --

11   Q.  Mr. Schiff --

12   A.  Judge Dorsey wanted to --

13          THE COURT:  Mr. Schiff, you'll --

14          THE WITNESS:  Yeah, all right.  That's what he said.

15   That's what he said.

16   BY MR. NEIMAN:

17   Q.  And you read this order before?  You're aware of this order?

18   A.  Of course I am.

19   Q.  And this order, does it not, reject the zero return as a

20   valid return?

21   A.  No.  First of all, it's not up to Judge Dorsey to determine

22   what a return was or not.  The hearing was whether I filed or I

23   didn't file.  And the fact is I filed.

24   Q.  Well --

25   A.  And Judge Dorsey couldn't figure out what a return was if

1    his life depended on it.

2    Q.  Well, you disagree with Judge Dorsey?

3    A.  Of course I do.

4    Q.  All right.

5    A.  He's also instructed my jury that they can convict me even

6    if the Government didn't prove the act of evasion I was charged

7    with -- with committing.

8    Q.  If we can look at the first paragraph of page 5.

9    A.  I didn't have -- I didn't have a lawyer though the law

10   required.

11   Q.  Well, Mr. Schiff, I think that's addressed in this order

12   where you were given the opportunity but you delayed, did you

13   not?

14   A.  I didn't hear what you just said.

15   Q.  If you look at -- footnote 1 of this order addresses that

16   very point, does it not?

17   A.  (Laughing.)  Yeah.  He lied.  The first thing the prosecutor

18   said and the first thing I said, I wanted a lawyer.

19   Q.  All right.  Mr. Schiff, Judge Dorsey in this order called

20   your zero return, did he not, a gimmick?

21   A.  Yeah.  Who is he?  He's just -- just a lawyer who knew a

22   governor and he came to be a judge.  He doesn't know more about

23   the income tax than I do.

24   Q.  You disagree with that characterization of it being a

25   gimmick by Judge Dorsey?

5054

1    produce any evidence at all, and no inference whatever may be

2    drawn from the election of a defendant not to testify.  The

3    Government has the burden of proving him guilty beyond a

4    reasonable doubt, and if it fails to do so you must acquit him.

5         "The punishment provided by law for this crime is for

6    the Court to decide.  You may not consider punishment in

7    deciding whether the Government has proved its case against the

8    Defendant beyond a reasonable doubt."

9         "Jury Instruction No. 2

10        "Proof beyond a reasonable doubt is proof that leaves

11   you firmly convinced that the Defendant is guilty.  It is not

12   required that the Government prove guilt beyond all possible

13   doubt.

14        "A reasonable doubt is a doubt based on reason and

15   common sense and is not based purely on speculation.  It may

16   arise from a careful and impartial consideration of all the

17   evidence, or from lack of evidence.

18        "If after a careful and impartial consideration of all

19   the evidence, you are not convinced beyond a reasonable doubt

20   that the Defendant is guilty, it is your duty to find the

21   Defendant not guilty.  On the other hand, if after a careful and

22   impartial consideration of all the evidence, you are convinced

23   beyond a reasonable doubt that the Defendant is guilty, it is

24   your duty to find the Defendant guilty.

25        "The evidence from which you are to decide the" --

EXHIBIT 2-S

1      "what the facts are consists of:  (1) the sworn testimony of

2      witnesses, both on direct and cross-examination, regardless of

3      who called the witnesses; (2) the exhibits which have been

4      received into evidence; and (3) any facts to which all the

5      lawyers have agreed or stipulated.

6           "Evidence may be direct or circumstantial.  Direct

7      evidence is direct proof of a fact, such as testimony of an

8      eyewitness.  Circumstantial evidence is indirect evidence, that

9      is, proof of a chain of facts from which you could find that

10     another fact exists, even though it has not been proved

11     directly.  You are to consider both kinds of evidence.  The law

12     permits you to give equal weight to both, but it is for you to

13     decide how much weight to give to any evidence.

14          "It is for you to decide whether a fact has been proved

15     by circumstantial evidence.  In making that decision, you must

16     consider all the evidence in the light of reason, common sense

17     and experience."

18          "Jury Instruction No. 3

19          "In reaching your verdict you may consider only the

20     testimony and exhibits received into evidence.  Certain things

21     are not evidence and you may not consider them in deciding what

22     the facts are.  I will list them for you.

23          "1.  Arguments and statements by lawyers are not

24     evidence.  The lawyers are not witnesses.  What they have said

25     in their opening statements or will say in their closing

EXHIBIT 2-t

1        "Jury Instruction No. 8

2        "You are here only to determine whether the defendants

3    are guilty or not guilty of the charges in the Indictment:   Your

4    determination must be made only from the evidence in the case.

5    The defendants are not on trial for any conduct or offense not

6    charged in the Indictment.   You should consider evidence about

7    the acts, statements, and intentions of others, or evidence

8    about other acts of a defendant, only as they relate to a charge

9    against that defendant."

10        "Jury Instruction No. 9

11        "Although the defendants are being tried together, you

12    must give separate consideration to each defendant.   In doing

13    so, you must determine which evidence in the case applies to

14    each defendant, disregarding any evidence admitted solely

15    against some other defendants.   The fact that you may find one

16    of the defendants guilty or not guilty should not control your

17    verdict as to any other defendants.

18        "A separate crime is charged against one or more of the

19    defendants in each count.   The charges have been joined for

20    trial.   You must decide the case of each defendant on each crime

21    charged against that defendant separately.   Your verdict on any

22    count as to any defendant should not control your verdict on any

23    other count or as to any other defendant.

24        "All of the instructions apply to each defendant and to

25    each count unless a specific instruction states that it applies

EXHIBIT 2-4